STATE OF NORTH CAROLINA v. THOMAS JACK BROWN

No. 65A85

(Filed 7 July 1987)

**1. Jury § 6.3— prospective juror—voir dire—acquaintance with defendant in prison—absence of prejudice**

The *voir dire* examination of a prospective juror ultimately excused for cause which elicited information that the prospective juror had been at a prison camp with defendant did not prejudice two jurors in whose presence the *voir dire* was conducted so as to have required the trial court to intervene *ex mero motu* where defendant neither objected to this line of questioning nor requested an individual *voir dire*; defendant did not challenge the two jurors for cause or exhaust. his peremptory challenges; and the error, if any, was not a fundamental error which would permit appellate review absent an objection in that it is unlikely that the deliberations of these two or other jurors might have been infected by this testimony.

**2. Jury § 7.11— prospective juror—ambivalence toward death penalty—inability to follow law—excusal for cause**

Although the *voir dire* testimony of a prospective juror may have indicated her ambivalence toward the death penalty, she was properly excused for cause where that testimony also demonstrated that she would be unable to render a verdict in accordance with the trial court's charge and the laws of the state.

**3. Homicide § 21.6— first degree murder—lying in wait—sufficient evidence**

The State's evidence was sufficient to support defendant's conviction of first degree murder perpetrated by lying in wait where it tended to show that defendant announced to several people his intention to kill the victim; defendant walked alone to the window beside the victim's office, waited for the victim to "bend down," and shot him; and the shot resulted in the victim's death.

**4. Homicide § 12— first degree murder by lying in wait—short-form indictment**

The State's proof of a murder perpetrated by lying in wait did not fatally vary from the "short-form" indictment charging defendant with first degree murder since (1) the indictment specifically referred to N.C.G.S. § 14-17, which expressly includes murder perpetrated by means of lying in wait in its definitions of first degree murder; (2) the short-form indictment drawn in accordance with N.C.G.S. § 15-144 is sufficient to charge murder in the first degree under a theory of lying in wait just as it is sufficient to charge murder in the first degree on the theory of felony murder or premeditation and deliberation; and (3) if defendant was at a loss to determine the specific facts underlying the charge alleged in the indictment, his proper recourse was to move for a bill of particulars. N.C.G.S. § 15A-925 (1983).

**5. Homicide § 30.1— first degree murder by lying in wait—submission of second degree murder not required by evidence**

In a prosecution for first degree murder perpetrated by lying in wait, evidence concerning defendant's intoxication and the provocation of an old

grudge and taunts by defendant's brother reflected upon intent to kill, which was irrelevant, and did not require the trial court to submit an issue as to second degree murder to the jury. Also, evidence of the short duration of the pause before the kill was irrelevant and did not require the submission of an issue as to second degree murder.

**6. Homicide § 24— instructions—lying in wait—no presumption of premeditation and deliberation**

The theory of lying in wait, as explained to the jury by the trial court, did not rely upon a conclusive presumption of premeditation and deliberation in violation of defendant's due process rights since the charge neither mentioned premeditation and deliberation nor urged the jury to presume their presence, and these elements are not presumed but are irrelevant in a prosecution for first degree murder perpetrated by lying in wait.

**7. Criminal Law § 102.6— jury argument—no impropriety**

In a prosecution for first degree murder perpetrated by lying in wait, the prosecutor's jury argument that "when a deadly weapon is used in certain ways and fashions, it gives rise to the crime of murder in the first degree" was so general as to be unobjectionable, and the prosecutor's argument that "it's not necessary for you to consider the question of premeditation and deliberation and malice aforethought" was an accurate statement of the law.

**8. Criminal Law § 102.6— jury argument—need for justice by victim's family**

The prosecutor's remarks in his jury argument in a first degree murder case reminding the jury of the victim's family's need for justice that only it could render had no effect on the verdict in light of the overwhelming evidence of defendant's guilt, and the trial court's failure to intervene *ex mero motu* was not error.

**9. Criminal Law § 34.2— evidence of prior crimes—absence of prejudice**

A witness's testimony that defendant "kept saying that he killed him; that it wasn't the first time; that he had killed two others besides" should have been excluded because it bore only upon defendant's propensity and disposition to commit such offenses. However, the admission of such testimony was not prejudicial and did not require the trial court to intervene *ex mero motu* when considered in the context of defendant's repeated boasting to the witness and other witnesses about his having killed the victim and in light of the overwhelming evidence that defendant had slain his victim by lying in wait.

**10. Criminal Law § 135.6— capital sentencing hearing—defendant's criminal record**

Defendant's copious criminal record was admissible in his sentencing hearing for first degree murder to rebut evidence of his good character offered through the testimony of his mother and his brother who both stated that defendant was generally amicable except when he had been drinking.

**11. Criminal Law §§ 102.9, 135.8— jury argument—defendant's lack of contrition— no improper aggravating factor**

The prosecutor's argument during the sentencing phase of a capital case concerning defendant's apparent lack of contrition did not improperly place this characteristic before the jury for consideration as an aggravating factor.

State v. Brown

**12. Criminal Law § 102.9 — jury argument — defendant's lack of contrition — no injection of opinion**

The prosecutor's argument in a capital case concerning defendant's apparent lack of contrition did not inject the prosecutor's own opinions into his argument but was rooted in the evidence and related to the demeanor of the defendant, which was before the jury at all times.

**13. Criminal Law § 102.8 — jury argument — defendant's lack of contrition — no comment upon failure to testify**

The prosecutor's argument concerning defendant's apparent lack of contrition did not constitute an improper comment upon defendant's failure to testify. N.C.G.S. § 8-54.

**14. Criminal Law § 102.13 — jury argument — no comment on right to appellate review**

The prosecutor's argument in a capital case that, no matter what sentence the jury recommended, defendant would "still be here in 90 days" did not constitute an improper remark on defendant's right to appellate review that required *ex mero motu* intervention by the trial court.

**15. Criminal Law § 102.13 — jury argument — no comment on possibility of parole**

The prosecutor's argument during the sentencing phase of a capital case that defendant had been sentenced to prison in 1978 for five years but was out in 1980, committing another sixteen offenses "in the three years before his so-called prison sentence expired" and his further reference to "that three-year period during which he should have been in prison" did not constitute an improper comment on the possibility of parole if defendant received a life sentence so as to require *ex mero motu* intervention by the trial court.

**16. Criminal Law § 102.6 — jury argument on sanctity of home — no injection of opinion**

Where all the evidence in a first degree murder case showed that the killing took place in the victim's home, the prosecutor's jury argument concerning the sanctity of the home was founded upon the evidence, not upon prosecutorial opinion or belief, and was not improper.

**17. Criminal Law § 102.6 — jury argument — rights of victim's family — absence of prejudice**

The prosecutor's argument during the sentencing phase of a capital case concerning the rights of the victim's family, even if erroneously admitted, was *de minimis*, and the trial court did not abuse its discretion in failing to correct the error *ex mero motu*.

**18. Criminal Law § 102.6 — jury argument — jury as conscience of the community**

The prosecutor's argument during the sentencing phase of a capital case which reminded the jury that, for purposes of defendant's trial, they are the voice and conscience of the community was not improper.

State v. Brown

**19. Criminal Law § 102.12— jury argument—life sentence unfair to other murderers receiving death penalty**

The prosecutor's argument urging the jury to recommend death because not to do so would be unfair to other convicted murderers sentenced to death was not so grossly improper as to require the trial court to strike the remark *sua sponte.*

**20. Criminal Law § 102.6— jury argument—failure of siblings to testify—reason for lack of schooling**

Although the prosecutor may have strained the rational connection between evidence and inference in commenting upon defendant's production of only one of his six siblings to testify in his behalf and in suggesting that defendant's lack of schooling was his own fault, he did not strain it so far as to require *ex mero motu* intervention by the trial court or to have affected adversely the jury's consideration of a nonstatutory mitigating circumstance.

**21. Criminal Law § 102.6— jury argument—portrayal as playing God**

The prosecutor's comments in a capital case portraying defendant as one who dared to play God and one who selfishly deprived the victim of his opportunity to "get right with the Lord" while retaining that opportunity for himself were not so improper as to have required intervention by the trial court *ex mero motu.*

**22. Criminal Law § 102.13— jury argument—death penalty as Biblical law**

The prosecutor's arguments in a capital case that the Bible approves punishment and condemns defendant's acts and that N.C.G.S. § 15A-2000 is a statute of judgment equivalent to Biblical law that a murderer shall be put to death were not equivalent to saying that state law is divinely inspired or that law officers are ordained by God and were not so improper as to have mandated *ex mero motu* intervention by the trial court.

**23. Criminal Law § 102.9— jury argument—disparagement of mitigating circumstances reflecting on character**

Remarks by the prosecutor which disparaged mitigating circumstances that reflect on a defendant's character as opposed to those that reflect on the particular crime did not improperly and prejudicially force the jury's focus away from considering factors regarding defendant's character.

**24. Criminal Law § 135.9— mitigating circumstances—definition—burden of proof**

Neither the prosecutor nor the trial court was incorrect in emphasizing that the burden of persuading the jury that mitigating circumstances exist is upon the defendant. Nor was it incorrect for the prosecutor to define a mitigating circumstance as one that may reduce the moral culpability of a crime or make it less deserving of extreme punishment than other first degree murders.

**25. Criminal Law §§ 102.12, 135.9— diminished capacity mitigating circumstance—argument unsupported by evidence—absence of prejudice**

In his argument that the diminished capacity mitigating circumstance should not be found by the jury in a capital case, the prosecutor's references

to insanity, mental illness, and whether defendant "knew" what he was doing, while irrelevant under the evidence presented, had no prejudicial impact sufficient to require *ex mero motu* intervention by the trial court. N.C.G.S. § 15A-2000(f)(6).

**26. Criminal Law §§ 102.6, 135.8— jury argument—victim's lack of opportunity to plead for life**

In a prosecution for murder by lying in wait, the prosecutor's argument at the sentencing hearing that the victim had no chance to plead with defendant for his life was not an improper argument that the jury should find the precipitous manner of the victim's death as an aggravating circumstance but was a proper description of the offense as it had occurred.

**27. Criminal Law § 135.8— capital sentencing hearing—conviction record—prior violent felony aggravating factor**

The State's introduction of the record of defendant's conviction of discharging a firearm into occupied property was sufficient to support the trial court's submission as an aggravating factor for murder by lying in wait that defendant had a prior conviction of a felony involving the use of violence to a person. N.C.G.S. § 15A-2000(e)(3).

**28. Criminal Law § 135.8— death penalty statute—murder by lying in wait—no violation of equal protection**

The death penalty statute, N.C.G.S. § 15A-2000, does not violate a defendant's right to equal protection where the same evidence may underlie a case of murder by premeditation and deliberation and a case of murder by lying in wait because a lesser included offense is available under the former charge but not under the latter.

**29. Criminal Law § 135.8— prior violent felony aggravating factor—constitutionality**

The aggravating factor that defendant had a prior conviction of a felony involving the use of violence to a person, N.C.G.S. § 15A-2000(e)(3), is not unconstitutionally vague and overbroad.

**30. Criminal Law § 122.2— capital case—instructions to deadlocked jury not required**

The Supreme Court declines to adopt a rule requiring the trial court in a capital case to instruct a deadlocked jury in accordance with N.C.G.S. § 15A-1235 because (1) it is the clear intent of the Legislature that instructions to a deadlocked jury be within the trial court's discretion, and (2) the provisions of N.C.G.S. § 15A-1235 do not govern sentencing procedures in capital cases.

**31. Criminal Law § 135.7— mitigating circumstance—instruction defining "extenuating"**

The trial court did not err in responding to the jury foreman's question during the sentencing phase of a capital case as to the meaning of "extenuating" in a nonstatutory mitigating circumstance by reading the definition from a dictionary since "extenuating" is neither a term of art nor clearly explained by its context.

**32. Criminal Law § 135.6— capital sentencing hearing—evidence from guilt-innocence phase**

The trial court in a capital case did not err in instructing the jury that evidence from the guilt-innocence phase was competent for its consideration in the punishment phase. N.C.G.S. § 15A-2000(a)(3).

**33. Criminal Law § 135.9— mitigating circumstances—burden of proof—due process**

Due process does not prohibit placing upon the defendant in a capital case the burden of proving mitigating circumstances by a preponderance of the evidence.

**34. Criminal Law § 135.9— capital case—mitigating circumstances—requirement of unanimity**

Requiring juries in a capital case to reach unanimous decisions regarding the presence or absence of mitigating circumstances does not render the sentencing proceeding arbitrary and capricious on the ground that a single juror can deprive all other jurors of consideration of such circumstances.

**35. Criminal Law § 135.7— capital case—instruction on substantiality of aggravating factor**

It was not error for the trial court to instruct the jury that it must determine the substantiality of the aggravating factor in light of mitigating circumstances "found" to exist since the jury is not permitted to consider unarticulated mitigating circumstances.

**36. Criminal Law § 135.10— murder by lying in wait—death penalty not disproportionate**

A sentence of death imposed on defendant for a murder perpetrated by lying in wait outside the victim's home was not imposed under the influence of passion, prejudice or any other arbitrary factor, the record supported the jury's finding of the aggravating circumstance upon which the sentencing court based its sentence of death, and the sentence of death was not disproportionate to the penalty imposed in similar cases considering the crime and the defendant.

DEFENDANT appeals of right pursuant to N.C.G.S. § 7A-27(a) from judgment entered by *Pope, J.*, at the 21 January 1985 Criminal Session of Superior Court, ROBESON County. Defendant was convicted of murder in the first degree and sentenced to death. Heard in the Supreme Court 13 April 1987.

*Lacy H. Thornburg, Attorney General, by David Roy Blackwell, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Geoffrey C. Mangum, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

This is a case of murder perpetrated by lying in wait. *See* N.C.G.S. § 14-17 (1986). The victim, Wayne Gerald, who had been working at his desk at home the evening of 5 May 1984, was killed by a single shotgun blast fired through the window beside him. He died instantaneously.

In pertinent part, the evidence at trial showed the following:

Around five o'clock the afternoon of 5 May 1984 defendant's brother Ray Brown and his friend Gary Presnell dropped by defendant's house. The three drank beer, played with defendant's children, and chatted. Presnell testified that defendant suddenly ran into the house, brought out a twelve-gauge shotgun, and urged his brother and Presnell to shoot it. The brother deferred, but Presnell shot the gun once into the air. Defendant returned the gun to the house and conversation resumed, eventually turning to the subject of defendant's missing moped. Defendant said he suspected Wayne Gerald had it and that he would "get him one way or another." Defendant told Presnell that Gerald had pistol-whipped him once, and he showed Presnell the scars.

The three continued to converse and drink beer, and the subject of the moped and Gerald's name came up repeatedly. At one point defendant jumped up, asked his companions if they would give him a ride, went in the house, and returned with the shotgun.

Presnell drove. Defendant asked him to go by Gerald's house and remarked that the lights were on and that Gerald was in his office. Presnell then drove to defendant's mother's house nearby, separated from Gerald's house by a rental house and a storage shed. The three got out and eventually walked to the backyard of defendant's mother's house. Presnell heard defendant's brother tell defendant that he "shouldn't do it" and heard defendant reply, "I'll kill him. If I don't, I'm a self-made son-of-a-bitch." A fourth friend joined the group and all but defendant then walked to the front of the house. They heard a shot, and defendant's brother said, "He's killed him."

Defendant's mother-in-law testified that the evening of 5 May defendant came to her trailer and told her "he had just killed the son-of-a-bitch," and he showed her with his hands how he had shot

the gun. He then laughed and asked her to take him home. On the ride back to defendant's house, he laughed again and said, "The son-of-a-bitch won't beat me no more." Once home, defendant repeated to his wife and later to his sister and brother-in-law that he had killed "the son-of-a-bitch," both times within his mother-in-law's earshot. Defendant also said he had disposed of the gun in the ditch behind the mailboxes near the mother-in-law's trailer.

Defendant's brother-in-law testified that he and his wife had just picked up his seventeen-year-old sister Angela from defendant's house the night of 5 May when defendant stopped him, bent down beside the car window, and

> asked me if I could keep a secret, and I told him yeah, and he said he killed the son-of-a-bitch, and I paused a minute and I said who, and he said Wayne Gerald, and he said that he had beat him and he pointed to his head, and he said "He won't beat me no more," and I told him that I said, you know, "The law is going to get you." He said, "No one will find out," and then he told me how he done it. He went up to the window. . . . . [T]ook the shotgun, he said, like this . . . . He said that Wayne Gerald looked over or something, he said he shot him right there [indicating the left eye] . . . . He said that he then run through the woods and hid the gun in a ditch, in water. And he said no one would ever find out.

Angela testified that she was on the porch at defendant's house waiting for her mother and stepfather to pick her up when defendant was dropped off by his mother-in-law. She testified that defendant demonstrated to her how he shot Gerald, saying "he snuck up to Wayne Gerald's house and he looked through the window and he said he had the gun like this, and he waited for Wayne Gerald to bend over . . . and he let it go, and he went 'boom' . . . ." Angela also testified that defendant told her he had thrown the gun in some water in a ditch. She walked with defendant and his wife to a nearby graveyard where defendant took an empty shotgun shell from his pocket and discarded it. Several times he repeated, laughing, that he had killed the "son-of-a-bitch" and that he had blown his brains out.

Medical testimony established that Gerald died instantaneously of a gunshot wound to the head. He had "multiple penetrating wounds on the left side of the face and head; and multiple

scalp lacerations and skull fractures of the head, with actual brain tissue protruding from some of those lacerations and fractures." There was "severe damage to the brain."

The jury found defendant guilty of first degree murder and recommended that he be sentenced to death. The trial court entered judgment accordingly.

GUILT PHASE

[1] Defendant first contends that the voir dire examination of a prospective juror who was ultimately excused for cause prejudiced the two jurors in whose presence the voir dire was conducted. The examination elicited the information that the prospective juror was already acquainted with defendant from their having been together at a prison camp. The prospective juror was asked whether defendant was at the camp before he arrived and after he left. Defendant argues that the prospective juror's affirmative answers were evidence of defendant's bad character deliberately and prejudicially placed before the jury, and that it was error for the trial court not to intervene *ex mero motu.*

Although defendant objected once to the leading form of one question during the voir dire, he neither objected to the line of questioning nor requested an individual voir dire. Further, he did not challenge any jurors for cause on this account, and he failed to exhaust his peremptory challenges. When a defendant challenges a juror for cause but fails to exhaust his peremptory challenges, he has waived his right to appeal the refusal of that challenge for cause. N.C.G.S. § 15A-1214(h)(1) (1983). *See State v. Johnson,* 317 N.C. 417, 431-33, 347 S.E. 2d 7, 16-17 (1986). When, as here, a defendant does not even attempt to challenge jurors whose impartiality he questions, logic compels a similar presumption of waiver. "A person charged with crime . . . may, after his plea, challenge individual jurors for cause or peremptorily. [Citation omitted.] But he cannot wait until the jury has returned a verdict of guilty to challenge the competency of the jury to determine the question." *State v. Rorie,* 258 N.C. 162, 165, 128 S.E. 2d 229, 231 (1962).

In addition, Rule 10(b)(1) of the Rules of Appellate Procedure requires that any exception urged on appeal must be preceded

"by objection noted" unless "by rule or law [the objection] was deemed preserved or taken without such action." *See, e.g., State v. Oliver*, 309 N.C. 326, 334, 307 S.E. 2d 304, 312 (1983). Absent objection, either noted or deemed taken by rule or law, review will be limited to those errors

> in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has "resulted in a miscarriage of justice or in the denial to appellant of a fair trial" or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*Id.* at 335-36, 307 S.E. 2d at 312, quoting *State v. Odom*, 307 N.C. 655, 660, 300 S.E. 2d 375, 378 (1983). *See also* N.C.G.S. § 15A-1446 (1983). It is unlikely that any prejudice colored the deliberations of these two jurors or that the deliberations of other jurors might have been infected by this testimony. The weight and abundance of evidence of defendant's guilt, and the negligible probability of prejudice resulting from the voir dire, do not qualify this as the "exceptional case" in which the error, if any, had a probable impact upon the jury's verdict.

[2] Defendant asserts it was also error for the trial court to excuse a prospective juror for cause based upon her statements that she had "mixed feelings" about the death penalty. The prospective juror was initially asked if she "could and would vote to impose" the death penalty if the State were to satisfy her beyond a reasonable doubt that it was the appropriate penalty in this case. Defendant's objection to the question was sustained, and the question was rephrased:

> Mr. Britt: Okay. Let me ask you this: If you are selected to sit on this jury, and if the State satisfies you, and satisfies you beyond a reasonable doubt, that the defendant . . . is guilty of exactly what he's charged with, would you vote to find him guilty?

Juror Number 2: I don't know.

Mr. Britt: Let me ask the question again: If the State satisfies you and satisfies you beyond a reasonable doubt that the defendant . . . is guilty of murder in the first degree . . . would you vote to find him guilty?

Juror Number 2: Well, like I said, I have mixed feelings about it.

Mr. Britt: I understand.

Juror Number 2: I don't know if I could.

Mr. Britt: You are saying, then, that you might not be able to find him guilty?

Juror Number 2: I might not.

Mr. Britt: Under no circumstances?

Juror Number 2: Yes.

Mr. Britt: So, what you are saying is you are not sure that you could be fair and impartial at the guilt phase?

Juror Number 2: Right.

Mr. Britt: And you are unable to say at this time that you would vote to find him guilty if the State satisfies you beyond a reasonable doubt that he's guilty; is that correct?

Juror Number 2: Yes, sir.

Defendant interprets these responses as the product of a misunderstanding and contends that they do not indicate that the prospective juror was either unwilling or unable to follow the law and her oath. *See, e.g., State v. Johnson,* 317 N.C. 343, 376-78, 346 S.E. 2d 596, 614-15 (1986). This is precisely what they do indicate, however. Regardless of the juror's feelings concerning the death penalty, a challenge for cause may be made if the voir dire demonstrates that "[a]s a matter of conscience, regardless of the facts and circumstances, [the juror] would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina." N.C.G.S. § 15A-1212(8) (1983). Although the voir dire testimony of this prospective juror may have indicated her ambivalence toward the death penalty, she was properly excused

State v. Brown

for cause because that testimony also demonstrated that she would be unable to render a verdict in accordance with the trial court's charge and the laws of the State.

[3] Defendant next argues that the trial court erred in denying his motion to dismiss the charge of first degree murder because the State's evidence was insufficient to convince a rational trier of fact beyond a reasonable doubt of defendant's guilt as to each element of the offense.

The trial court instructed the jury on murder in the first degree solely on the basis of lying in wait. Murder perpetrated by lying in wait "refers to a killing where the assassin has stationed himself or is lying in ambush for a private attack upon his victim." *State v. Allison*, 298 N.C. 135, 147, 257 S.E. 2d 417, 425 (1979). *See State v. Wiseman*, 178 N.C. 784, 789-90, 101 S.E. 629, 631 (1919). The assassin need not be concealed, nor need the victim be unaware of his presence: "If one places himself in a position to make a private attack upon his victim and assails him at a time when the victim does not know of the assassin's presence or, if he does know, is not aware of his purpose to kill him, the killing would constitute a murder perpetrated by lying in wait." *State v. Allison*, 298 N.C. at 148, 257 S.E. 2d at 425.

There is ample evidence that defendant's announced intention was to kill the victim, that he walked alone to the window beside the victim's office, that he waited for the victim to "bend down," that he shot him, and that the shot resulted in death. Even a moment's deliberate pause before killing one unaware of the impending assault and consequently "without opportunity to defend himself," *State v. Wiseman*, 178 N.C. at 790, 101 S.E. at 631, satisfies the definition of murder perpetrated by lying in wait. We hold that the testimony of several witnesses recounting defendant's announced purpose and his iterative description of the killing itself was abundant evidence to convince a rational jury beyond a reasonable doubt that defendant was guilty of this crime.

[4] As alternative support for his argument that his motion to dismiss was erroneously denied, defendant contends that the State's proof fatally varied from the indictment. *E.g., State v. Waddell*, 279 N.C. 442, 445, 183 S.E. 2d 644, 646 (1971). Defendant

was charged in a "short-form" indictment, authorized by N.C.G.S. § 15-144, that read in pertinent part:

> The jurors for the State upon their oath present that on or about the date of offense shown and in the county named above the defendant unlawfully, willfully and feloniously and of malice aforethought did kill and murder Robert Wayne Gerald.

The short-form indictment has been held sufficient to charge murder in the first degree on the basis of either felony murder or premeditation and deliberation. *State v. Avery*, 315 N.C. 1, 13-14, 337 S.E. 2d 786, 792 (1985). Defendant suggests that the holding in *Avery* rests only upon the notice rationale, such that a defendant who has been indicted for both murder and the underlying felony has notice as to the need to defend a felony-murder. *See State v. Silhan*, 302 N.C. 223, 235, 275 S.E. 2d 450, 461 (1981). N.C.G.S. § 15-144 provides that indictments for murder need not allege "matter not required to be proved on the trial." Defendant argues that, by negative implication, a short-form indictment must allege matters necessary to proof of the offense of murder perpetrated by lying in wait. In support of this argument defendant cites N.C.G.S. § 15A-924(a)(5), which requires that a criminal pleading contain

> [a] plain and concise factual statement in each count which, without allegations of an evidentiary nature, asserts facts supporting every element of a criminal offense and the defendant's commission thereof with sufficient precision clearly to apprise the defendant or defendants of the conduct which is the subject of the accusation.

For three reasons we disagree with defendant's contention that the indictment fatally varied from the proof:

First, N.C.G.S. § 14-17 does not divide first degree murder into separate offenses, each of which has its own essential elements, but divides the offense into four distinct classes according to the proof required for each. *State v. Strickland*, 307 N.C. 274, 282, 298 S.E. 2d 645, 651 (1983), *modified on other grounds*, *State v. Johnson*, 317 N.C. 193, 344 S.E. 2d 775 (1986). The indictment charging defendant with murder in the first degree referred specifically to N.C.G.S. § 14-17. That statute provides, *inter alia*: "A

murder which shall be perpetrated by means of . . . lying in wait . . . shall be deemed to be murder in the first degree . . . ." N.C.G.S. § 14-17 (1986). Because the indictment specifically referred to N.C.G.S. § 14-17, which expressly includes murder perpetrated by means of lying in wait in its definitions of first degree murder, defendant cannot realistically claim, under the facts here, to have been altogether unapprised of the theory of the case against him.

Second, we observed in *State v. Freeman*, 314 N.C. 432, 436, 333 S.E. 2d 743, 746 (1985) that the new Criminal Procedure Act, of which § 15A-924 is a part, was "adopted for the purpose of making the law more understandable and improving the administration of justice." It was not the intention of the General Assembly to obfuscate and complicate procedure, but to clarify and simplify it. In the spirit of this intention, we hold that the short-form indictment drawn in accordance with N.C.G.S. § 15-144 is sufficient to charge murder in the first degree under a theory of lying in wait, just as it is sufficient to charge murder in the first degree on the theory of felony murder or premeditation and deliberation. *State v. Avery*, 315 N.C. at 13-14, 337 S.E. 2d at 793.

Third, if, despite the sufficiency of the indictment, defendant was at a loss to determine the specific facts underlying the charges alleged in the indictment, his proper recourse was to move for a bill of particulars. N.C.G.S. § 15A-925 (1983). *See, e.g., State v. Hawley*, 186 N.C. 433, 437, 119 S.E. 888, 891 (1923).

[5] Next, defendant contends that the evidence of lying in wait was in conflict and that the evidence supported submitting to the jury the charge of murder in the second degree. This Court has recently held

> that premeditation and deliberation is not an element of the crime of first-degree murder perpetrated by means of poison, lying in wait, imprisonment, starving, or torture. Likewise, a specific intent to kill is equally irrelevant when the homicide is perpetrated by means of poison, lying in wait, imprisonment, starving, or torture; and . . . an intent to kill is not an element of first-degree murder where the homicide is carried out by one of these methods.

*State v. Johnson*, 317 N.C. at 203, 344 S.E. 2d at 781. *See State v. Evangelista*, 319 N.C. 152, 158, 353 S.E. 2d 375, 380 (1987). The

Court accordingly held that it was not error for the trial court not to instruct the jury on murder in the second degree, even though defendant urged that he did not administer poison with the intent to kill the victim: intent was irrelevant.

Here, as in *Johnson*, the State's evidence was sufficient to satisfy its burden, and there was no evidence other than defendant's plea of not guilty to negate the elements of murder perpetrated by lying in wait. The evidentiary conflict defendant urges us to recognize concerns defendant's intoxication, and the provocation of an old grudge and taunts by defendant's brother. These facts reflect upon intent to kill, which is irrelevant. Defendant also urges that the period of time in which he lay in wait and shot the victim encompassed a brief, unbroken course of conduct. The duration of the pause before the kill is likewise irrelevant. Neither contention suggests a conflict sufficient to negate the State's evidentiary proof that defendant committed murder perpetrated by lying in wait.

Just as "[a]ny murder committed by means of poison is automatically first-degree murder[,]" *id.* at 204, 344 S.E. 2d at 782, so any murder committed by means of lying in wait is automatically first degree murder. We accordingly hold there was no error in the failure to instruct on murder in the second degree.

[6] Defendant argues in the alternative that the theory of lying in wait, as explained to the jury by the trial court, relied upon a conclusive presumption of premeditation and deliberation in violation of defendant's due process rights. *See Francis v. Franklin*, 471 U.S. 307, 313-15, 85 L.Ed. 2d 344, 353-54 (1985). The trial court charged:

[F]or you to find the defendant guilty of first degree murder, perpetrated by lying in wait, the State must prove three things beyond a reasonable doubt:

First, that the defendant lay in wait for Robert Wayne Gerald. That is, waited and watched for Robert Wayne Gerald, in secret ambush, for the purpose of killing Robert Wayne Gerald.

Second, that the defendant shot Robert Wayne Gerald, intending to kill him.

And third, that the shooting was a proximate cause of Robert Wayne Gerald's death. A proximate cause is a real cause, a cause without which Robert Wayne Gerald's death would not have occurred.

In most respects,[1] this charge is an accurate statement of the law and neither mentions premeditation and deliberation nor urges that the jury presume their presence. These elements are not presumed but irrelevant. *State v. Johnson*, 317 N.C. at 203, 433 S.E. 2d at 781.

Defendant next contends that the trial court erred in failing to intervene *ex mero motu* at three points in the prosecutor's closing argument. We note at the outset the high threshold for abusing the license to argue the evidence, its inferences, and the law:

> [C]ounsel will be allowed wide latitude in the argument of hotly contested cases. [Citation omitted.] Counsel for each side may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his or her side of the case. [Citation omitted.] Decisions as to whether an advocate has abused this privilege must be left largely to the sound discretion of the trial court.

*State v. Huffstetler*, 312 N.C. 92, 112, 322 S.E. 2d 110, 123 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985).

Defendant failed to object at any one of these opportunities. Under these circumstances the standard for review is the following:

> In capital cases . . . an appellate court may review the prosecution's argument, even though defendant raised no objection at trial, but the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex*

---

1. At the time of defendant's trial, *State v. Johnson*, 317 N.C. 193, 344 S.E. 2d 375, holding that an intent to kill is not an element of murder in the first degree perpetrated by one of the methods described in N.C.G.S. § 14-17, had not been filed. However, it is obvious that the trial court's inclusion of specific intent as one of the elements the State must prove in no way disadvantaged defendant.

*mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.

*State v. Johnson*, 298 N.C. 355, 369, 259 S.E. 2d 752, 761 (1979).

[7] In the first instance of which defendant complains, the prosecutor told the jury that "when a deadly weapon is used in certain ways and fashions, it gives rise to the crime of murder in the first degree." In the second instance, the prosecutor told the jury,

[t]herefore, in a case of secret ambush, such as you have here before you today, your job is immensely simplified, because the law only requires th[e] State to prove three things beyond a reasonable doubt, and it's not necessary for you to consider the question of premeditation and deliberation and malice aforethought.

Each remark, defendant avers, was an "improper and prejudicial misstatement of the law" that operated to diminish the State's burden of proving guilt beyond a reasonable doubt. Such an error in violation of defendant's constitutional rights is presumed prejudicial. *See* N.C.G.S. § 15A-1443(b) (1983).

We disagree, however, with defendant's assessment of the impropriety or error in the prosecutor's remarks. The first remark is so general as to be unobjectionable. The second is, on the whole, an accurate statement of the law similar to the jury instruction later given by the trial court. Neither was so grossly improper that the court should have been expected to intervene *ex mero motu.*

[8] Defendant also excepts to a third portion of the prosecutor's closing argument in which he urged the jury:

Please remember something when you go back in the jury room. The 5th of May, 1984, was the most important day in the life of Wayne Gerald's family, as well as the most important day for [defendant] . . . . The family of the victim has no one to turn to but you. You are the triers of the facts. You are justice today. You are justice.

This Court has stressed that a jury's decision "must be based solely on the evidence presented at trial and the law with respect thereto, and not upon the jury's perceived accountability to the witnesses, to the victim, to the community, or to society in

general." *State v. Boyd*, 311 N.C. 408, 418, 319 S.E. 2d 189, 197 (1984), *cert. denied*, 471 U.S. 1030, 85 L.Ed. 2d 324 (1985). Such arguments are not appropriate in the guilt phase of the trial, in which the jury's focus is properly upon guilt or innocence, not upon mercy, prejudice, pity or fear. *State v. Oliver*, 309 N.C. at 360, 307 S.E. 2d at 326.

While the remarks in question veer toward a disregard of the admonitions in *Boyd* and *Oliver*, it cannot be said that the court erred in failing to recognize and correct "*ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Johnson*, 298 N.C. at 369, 259 S.E. 2d at 761. Evidence in the record supporting a finding of defendant's guilt was overwhelming. Under such circumstances, we hold that the prosecutor's remark reminding the jury of the victim's family's need for justice that only it could render had no effect on the verdict. *See* N.C.G.S. § 15A-1443(a) (1983).

[9]   In defendant's final assignment of error from the guilt phase of his trial, he contends that the trial court committed prejudicial error in failing to intervene *ex mero motu* when Angela, the sister of defendant's brother-in-law, testified that defendant "kept saying that he killed him; that it wasn't the first time; that he had killed two others besides." Again, defendant failed to object at trial but now asserts that the trial court's failure to take curative action constituted plain error. *See State v. Black*, 308 N.C. 736, 740-41, 303 S.E. 2d 804, 806-7 (1983).

Defendant's statement about his role in other offenses unrelated to the offense for which he was being tried was not admissible, for it bore only upon his propensity and predisposition to commit such offenses. *See, e.g., State v. Shane*, 304 N.C. 643, 653-54, 285 S.E. 2d 813, 820 (1982); *State v. McQueen*, 295 N.C. 96, 123, 244 S.E. 2d 414, 430 (1978), *overruled on other grounds, State v. Peoples*, 311 N.C. 515, 319 S.E. 2d 177 (1984). However, in the context of defendant's iterative boasting to Angela and other witnesses about his having killed the victim, the mere mention that he had killed two others besides, without any elaboration, could not have been prejudicial. Nor could it have been so in the face of the overwhelming evidence that defendant had slain his victim by lying in wait.

We conclude that, as to the guilt-innocence phase of his trial, defendant received a fair trial free from prejudicial error.

SENTENCING PHASE

**[10]** Defendant first contends that the State improperly introduced his criminal record from 1970 to 1984. Defendant had made no effort to rely upon the mitigating factor of no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1) (1983), and he argues that the State's offering his criminal record in rebuttal of a factor that was never relied upon was improper and prejudicial.

Bad reputation or character is not listed in N.C.G.S. § 15A-2000(e) as an aggravating circumstance, and the State may not offer evidence of the defendant's bad character in its case in chief. *State v. Silhan*, 302 N.C. at 273, 275 S.E. 2d at 484. Nor is such evidence admissible when its sole purpose is to rebut mitigating circumstances upon which the defendant might later rely. *State v. Taylor*, 304 N.C. 249, 277, 283 S.E. 2d 761, 779 (1981), *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983). However, when a defendant offers evidence of any circumstance that may reasonably be deemed to have mitigating value, whether or not it appears in the statutory list, the State may rebut this with evidence of a defendant's bad character. *State v. Silhan*, 302 N.C. at 273, 275 S.E. 2d at 484.

At his sentencing hearing defendant offered evidence of his good character through the testimony of his mother and his brother Bennett, who both said on direct examination that defendant was generally amicable except when he had been drinking. Defendant's copious criminal record, listing over thirty offenses, the bulk of which were associated with intoxication and a third of which were assaults, was offered to rebut this testimony. On the authority of *Silhan*, we thus hold this assignment of error meritless.

The bulk of defendant's remaining arguments concerning sentencing focus upon remarks in the prosecutor's closing argument. We have repeatedly held that counsels' arguments must be left to the control and discretion of the trial court and that counsel for both sides are entitled to argue to the jury the law and the facts in evidence and all reasonable inferences that may be drawn

therefrom. *E.g., State v. Huffstetler*, 312 N.C. at 112, 322 S.E. 2d at 123, *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169; *State v. Monk*, 286 N.C. 509, 515, 212 S.E. 2d 125, 131 (1975).

Defendant objected to only one of these remarks—that in which the prosecutor called attention to defendant's stoic appearance at trial, suggesting that defendant neither felt nor indicated contrition for his act. Defendant avers that these remarks were, in effect, an improper comment upon his failure to testify and that it was improper to raise the issue of an absence of remorse. The prosecutor argued:

> Did you hear, did you hear the lawyer's argument in phase I? Did you hear him say, "We are in sympathy with the widow. I'm in sympathy with the widow. Thomas Brown is in sympathy with the widow." Did you hear that? Let me ask you something, Ladies and Gentlemen of the Jury. One of the most salient facts in this case, a fact that you cannot escape, was: Have you seen this defendant express one iota of being sorry in this case, of being contrite? Has he demonstrated to you any contrition . . . . any contrition at all, Ladies and Gentlemen of the Jury? Has he demonstrated to you any remorse, any desire for forgiveness in this case?

> Did you observe, when this widow was on this witness stand testifying and broke down into sobs and it took several minutes for her to gain control of herself, did you see one tear roll down the face of this defendant sitting over here? If you watched him—and some of you did—you saw him sitting there very coolly, very coolly, musing, watching, calculating.

[11] Defendant insists that lack of remorse is an irrelevant factor in a case such as this in which the heinous, atrocious or cruel aggravating circumstance (N.C.G.S. § 15A-2000(e)(9) ) was not submitted, *e.g., State v. Oliver*, 309 N.C. at 346-47, 307 S.E. 2d at 318-19, or in which remorselessness was not offered to rebut the nonstatutory mitigating circumstance that although the act itself may have been harmful, defendant had not shown himself to be otherwise evil. *See State v. Brown*, 306 N.C. 151, 180, 293 S.E. 2d 569, 588, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982). Evidence of the absence of remorse "sometime after the commission [of the offense] when defendant has had an opportunity to reflect on his criminal deed" has been approved to support a nonstatuto-

ry aggravating factor under the Fair Sentencing Act, N.C.G.S. § 15A-1340.4 (1983). *State v. Parker*, 315 N.C. 249, 257, 337 S.E. 2d 497, 502 (1985).

N.C.G.S. § 15A-2000(e) dictates that aggravating factors to be considered shall be limited to those listed in the statute. *See State v. Silhan*, 302 N.C. at 273, 275 S.E. 2d at 484. Remorselessness is not one of these and may not be submitted to the jury as an aggravating factor in capital sentencing cases. Here, however, the State made no attempt to submit this characteristic as an aggravating circumstance. It was not placed before the jury for consideration as an aggravating factor, either verbally or on the verdict sheet. Defendant's argument in this regard is unavailing.

[12] Defendant also complains that the prosecutor's argument concerning defendant's apparent absence of contrition improperly placed before the jury "incompetent and prejudicial matters by injecting his own knowledge, beliefs, and personal opinions not supported by the evidence." *State v. Britt*, 288 N.C. 699, 711, 220 S.E. 2d 283, 291 (1975); N.C.G.S. § 15A-1230(a) (1983). We disagree. Urging the jurors to observe defendant's demeanor for themselves does not inject the prosecutor's own opinions into his argument, but calls to the jurors' attention the fact that evidence is not only what they hear on the stand but what they witness in the courtroom. In *State v. Myers*, 299 N.C. 671, 679-80, 263 S.E. 2d 768, 773-74 (1980), this Court considered the propriety of a similar argument, in which the prosecuting attorney noted that defendant "didn't flinch. Didn't bat an eye" when photographs of the crime were passed amongst the jury. "I don't know if you were watching him but no remorse [showed in his face]. . . . Not a word of remorse and not a sign of it here in the courtroom during this trial." *Id.* We held unanimously that these remarks were "rooted in the evidence," and related "to the demeanor of the defendant, which was before the jury at all times." *Id.* at 680, 263 S.E. 2d at 774. The same can be said concerning the prosecutor's remarks at issue here.

[13] Nor are these remarks truly tantamount to commenting on defendant's failure to testify, as defendant contends. This Court has been vigilant in protecting defendants' constitutional and statutory privilege not to testify. N.C.G.S. § 8-54 (1986). *E.g., State v. Monk*, 286 N.C. at 516-17, 212 S.E. 2d at 131-32. But we have held

it proper for the prosecution to comment upon defendant's failure to produce exculpatory evidence, his failure to offer evidence to rebut the State's case, or his failure to produce witnesses to corroborate the truth of an alibi. *See State v. Young*, 317 N.C. 396, 414, 346 S.E. 2d 626, 637 (1986), and cases cited therein. Just as such remarks do not infringe upon defendant's right not to testify because they were not directed at his failure to take the stand, so the prosecutor's calling the jury's attention to the defendant's demeanor made no reference to or inference about his decision not to testify. *Cf. State v. Monk*, 286 N.C. at 514-16, 212 S.E. 2d at 130 (prosecutor's direct reference to rule of law that a defendant's criminal record cannot be introduced "unless that person testified from this witness stand" held improper). This assignment of error is overruled.

Defendant next contends that the prosecutor improperly argued to the jury concerning: defendant's right to appellate review, the possibility of parole, the sanctity of the home, the rights of the victim and his family, community sentiment, the jury's role in assisting the prosecution, and the unfair impact on others convicted of murder if defendant was not sentenced to death. Defendant failed to object to any of these remarks. As we have already indicated with regard to the prosecutor's arguments in the guilt phase, in a capital case "an appellate court may review the prosecution's argument in spite of counsel's laxity." *State v. Smith*, 294 N.C. 365, 377, 241 S.E. 2d 674, 681-82 (1978). But again, in such cases "the alleged impropriety must be glaring or grossly egregious for this Court to determine that the trial court erred in failing to take corrective action *sua sponte*." *State v. Pinch*, 306 N.C. 1, 18, 292 S.E. 2d 203, 218 (1982), *cert. denied, Smith v. North Carolina*, 459 U.S. 1056, 74 L.Ed. 2d 622, *reh'g denied, Pinch v. North Carolina*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983). *See State v. Hill*, 311 N.C. 465, 472-73, 319 S.E. 2d 163, 168 (1984); *State v. Kirkley*, 308 N.C. 196, 209-11, 302 S.E. 2d 144, 152-53 (1983); *State v. Johnson*, 298 N.C. at 369, 259 S.E. 2d at 761.

[14] Defendant first argues that the prosecutor's reminder that, no matter what sentence the jury recommended, defendant would "still be here in ninety days" improperly suggested defendant's right to appellate review. We acknowledge the bar in capital cases against comment on a defendant's right to appellate review, *e.g., State v. Jones*, 296 N.C. 495, 501-02, 251 S.E. 2d 425, 429

(1979), but the connection between the remark here and the right to appellate review was tenuous at best. Consequently, we find no gross impropriety that required *ex mero motu* intervention by the trial court.

[15]  In addition, defendant argues that improper and prejudicial reference to the possibility of parole was implied in the prosecutor's remark that defendant had been sentenced to prison in 1978 for five years but was out in 1980, committing another sixteen offenses "in the three years before his so-called prison sentence expired." The prosecutor concluded, "Now, we aren't talking about his whole criminal record[;] we are just talking about that three-year period during which he should have been in prison. Does that mean anything to you, Ladies and Gentlemen?" Defendant suggests that what the prosecutor intended that information to convey was that parole was a likelihood and recidivism a certainty if the jury recommended a life sentence.

Although a defendant's eligibility for parole is not a proper matter for the jury's consideration, *State v. Cherry*, 298 N.C. 86, 101, 257 S.E. 2d 551, 561 (1979), *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 796 (1980), the subject is not directly apparent in the prosecutor's argument. The word "parole" was never used, and there was no mention of the possibility that a life sentence could mean release in twenty years. *See State v. Johnson*, 298 N.C. at 367, 259 S.E. 2d at 760. Here, as in *Johnson*, the prosecutor "argue[d] vigorously for the imposition of the death penalty," as it is his right and duty to do in a prosecution for murder in the first degree. *Id.* And, as in *Johnson*, "[w]e are of the opinion that the District Attorney's argument did not suggest the possibility of parole." *Id.* In any event, it did not do so in so direct a manner as to amount to a gross impropriety that required *ex mero motu* intervention by the trial court.

[16]  Defendant next contends that the prosecutor's reference to the sanctity of the home is akin to the argument that execution is required to deter other criminals, which was held improper as an expression of the prosecutor's personal opinion in *State v. Kirkley*, 308 N.C. at 215, 302 S.E. 2d at 155. In *Kirkley*, however, this Court held that the deterrence argument, more blatantly asserted in that case yet similarly made without objection, was not so grossly improper as to require intervention by the trial

court *ex mero motu. Id. See also State v. Hamlet*, 312 N.C. 162, 174, 321 S.E. 2d 837, 845 (1984); *State v. Hill*, 311 N.C. at 475, 319 S.E. 2d at 169-70. Here, where all the evidence showed that the killing took place in the victim's home, the prosecutor's remarks concerning the sanctity of the home were not improper. They were clearly founded upon the evidence, not upon prosecutorial opinion, belief or personal knowledge. *See State v. Pinch*, 306 N.C. at 17-18, 292 S.E. 2d at 218, *cert. denied, Smith v. North Carolina*, 459 U.S. 1056, 74 L.Ed. 2d 622, *reh'g denied, Pinch v. North Carolina*, 459 U.S. 1189, 74 L.Ed. 2d 1031.

[17] Defendant also complains that the prosecutor crossed the boundary into improper argument when he urged the death penalty in acknowledgment of the rights not only of the victim, held proper in *State v. Pinch*, 306 N.C. at 25, 292 S.E. 2d at 222, *cert. denied, Smith v. North Carolina*, 459 U.S. 1056, 74 L.Ed. 2d 622, *reh'g denied, Pinch v. North Carolina*, 459 U.S. 1189, 74 L.Ed. 2d 1031, but those of his family also. The United States Supreme Court has recently held in *Booth v. Maryland*, 55 U.S.L.W. 4836 (U.S. June 15, 1987) (No. 86-5020), that consideration of a "victim impact statement" at the sentencing phase of a capital trial violates the Eighth Amendment because its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner. *Id.* at 4837. The Court stated that two types of information elicited by the statement—1) "the personal characteristics of the victims and the emotional impact of the crimes on the family" and 2) "the family members' opinions and characterizations of the crimes and the defendant"—are irrelevant to a capital sentencing decision. *Id.* This information "could well distract the sentencing jury from its constitutionally required task—determining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime." *Id.* at 4839.

The Supreme Court's decision in *Booth* brings into question language in *Pinch* and *Oliver* that the value of the victim's life may be considered by the jury during sentencing. *See State v. Pinch*, 306 N.C. at 25, 292 S.E. 2d at 222, *cert. denied, Smith v. North Carolina*, 459 U.S. 1056, 74 L.Ed. 2d 622, *reh'g denied, Pinch v. North Carolina*, 459 U.S. 1189, 74 L.Ed. 2d 1031; *State v. Oliver*, 309 N.C. at 360, 307 S.E. 2d at 326. If the touchstone for

propriety in sentencing arguments is whether the argument relates to the character of the criminal or the nature of the crime, *see State v. Oliver*, 309 N.C. at 360, 307 S.E. 2d at 326, then, arguably, the effects of that crime on those the victim leaves behind are not relevant.

In this case, however, no evidence was placed before the jury concerning the personal qualities of the victim or the devastation wrought upon his family by his death. The prosecutor's argument merely alluded generally to the fact that, not only does a defendant have certain rights under our laws, but so do the victim and his family. The prosecutor argued:

> [I]t's not all a matter of the rights of this defendant. It's the rights of others. It's the rights of you. It's the rights of your family; of the community that you live in; of the family of this victim sitting out here in the Courtroom.

This reference to the family's rights, even if erroneously admitted, was *de minimis*. The trial court did not abuse its discretion in failing to recognize and correct the error *ex mero motu. State v. Johnson*, 298 N.C. at 368-69, 259 S.E. 2d at 761.

[18] Defendant also excepts to portions of the prosecutor's argument in which he attempted to impress the jury with the importance of its role in the criminal justice system:

> This defendant displayed a heartless, evil, callous disregard for the victim. He was without conscience, he was without pity. His was a wicked and vile act, Ladies and Gentlemen of the Jury, and when you hear of such acts, you say, "Gee, somebody ought to do something about that."
>
> You know something, Ladies and Gentlemen of the Jury, today you are the somebody that everybody talks about, and justice is in your lap. The officers can't do any more. The State can't do any more. You speak for all the people of the State of North Carolina as to this bloody murder in the first degree.

Defendant contends that these remarks improperly inform the jury that community or public sentiment urges the death penalty and that the jury is effectively an arm of the State in the prosecution of the defendant. These would be improper suggestions. The

State must not ask the jury "to lend an ear to the community rather than a voice." *State v. Scott,* 314 N.C. 309, 312, 333 S.E. 2d 296, 298 (1985), quoting *Prado v. State,* 626 S.W. 2d 775, 776 (Tex. Crim. App. 1982). But these suggestions do not arise from this argument, which does no more than remind the jurors that "the buck stops here" and that for purposes of defendant's trial, they are the voice and conscience of the community. *State v. Scott,* 314 N.C. at 311-12, 333 S.E. 2d at 297-98. Nor is there any improper suggestion that the jury is the last link in the State's chain of law enforcement. The jury is merely admonished of its general responsibility impartially to assimilate the evidence of aggravating and mitigating circumstances, to weigh them, and to recommend defendant's sentence accordingly. *See State v. Goodman,* 298 N.C. 1, 21, 257 S.E. 2d 569, 583 (1979).

[19] Defendant also argues the impropriety of a remark made by the prosecutor while reviewing the verdict sheet with the jury. The prosecutor urged the jury to recommend death because not to do so would be unfair to other convicted murderers sentenced to death.

N.C.G.S. § 15A-2000(d)(2) requires this Court to assess every capital case in which the defendant was sentenced to death under the provisions of N.C.G.S. 15A, Article 100, and to gauge the fairness of that sentence in the light of similar capital cases reviewed by this Court. The fate of other capital offenders thus is the concern of this Court pursuant to its proportionality review function. It is not a proper concern of jurors. The "factors to be considered by the jury in sentencing are 'the *defendant's* age, character, education, environment, habits, mentality, propensities and record.'" *State v. Taylor,* 304 N.C. at 284, 283 S.E. 2d at 783, *cert. denied,* 463 N.C. 1213, 77 L.Ed. 2d 1398, *reh'g denied,* 463 U.S. 1249, 77 L.Ed. 2d 1456, quoting *State v. Cherry,* 298 N.C. at 98, 257 S.E. 2d at 559, *cert. denied,* 446 U.S. 941, 64 L.Ed. 2d 796. We do not find the prosecutor's remarks here so grossly improper, however, that it was an abuse of the trial court's discretion not to strike them *sua sponte.*

[20] Defendant next argues that the prosecutor deprived him of a fair sentencing hearing by asserting improper arguments concerning defendant's failure to produce siblings who could testify on his behalf. The prosecutor asked:

Of six brothers and sisters, how many did he have up here begging for him? Testifying for him? Out of six of them, how many did he have? Out of his whole family, how many brothers and sisters did he have? One. Bennett, a man with a record of his own. That tell you something, Ladies and Gentlemen of the Jury?

Defendant contends that such commentary is improper when there is no way to tell whether a witness is unavailable. In arguing that the prosecutor was commenting negatively on defendant's limitation of witnesses called to testify in his behalf, defendant recalls this Court's disapproval of sentencing hearings that are effectively "mini-trials," in which witnesses testify as to matters of dubious probative value for sentencing purposes. *See generally, State v. Moose*, 310 N.C. 482, 491, 313 S.E. 2d 507, 514 (1984); *State v. Pinch*, 306 N.C. at 19, 292 S.E. 2d at 219, *cert. denied, Smith v. North Carolina*, 459 U.S. 1056, 74 L.Ed. 2d 622, *reh'g denied, Pinch v. North Carolina*, 459 U.S. 1189, 74 L.Ed. 2d 1031; *State v. Silhan*, 302 N.C. at 272, 275 S.E. 2d at 484.

Defendant also contends that the prosecutor misstated the testimony of defendant's mother, who had said that she did not know why defendant had quit school in the eighth or ninth grade. The prosecutor argued that defendant had "voluntarily quit school, . . . [he] just wouldn't do it and quit." The jury did not find as a nonstatutory mitigating factor that defendant had little education, and defendant surmises that the reason it did not was the prosecutor's suggestion that defendant's lack of schooling was his own fault.

We find both contentions meritless. Generally, and in this particular instance, the prosecutor may draw the jury's attention to defendant's failure to produce exculpatory witnesses available to him. *State v. Thompson*, 293 N.C. 713, 717, 239 S.E. 2d 465, 469 (1977); *State v. Tilley*, 292 N.C. 132, 144, 232 S.E. 2d 433, 441 (1977). And although the prosecutor "should refrain from characterizations of defendant which are calculated to prejudice him in the eyes of the jury when there is no evidence from which such characterization may legitimately be inferred," *State v. Britt*, 288 N.C. at 712, 220 S.E. 2d at 291, the prosecutor may argue inferences reasonably drawn from the evidence. *State v. Huffstetler*, 312 N.C. at 112, 322 S.E. 2d at 123, *cert. denied*, 471 U.S. 1009,

85 L.Ed. 2d 169. Although the prosecutor may have strained the rational connection between evidence and inference, he did not strain it so far as to require *ex mero motu* intervention by the trial court nor so far as to have affected adversely the jury's consideration of a nonstatutory mitigating factor.

[21]   Defendant also takes issue with the prosecutor's numerous references to the Bible. Among these was the prosecutor's portrait of defendant as one who dared to play God and one who selfishly deprived the victim of his opportunity to "get right with the Lord" while retaining that opportunity for himself. We do not find these comments so improper as to have required intervention by the trial court *ex mero motu.*

[22]   In a similar vein the prosecutor remarked that the Bible approves punishment and condemns defendant's acts, and he argued that N.C.G.S. § 15A-2000 is a statute of judgment equivalent to the Biblical law that a murderer shall be put to death. These remarks are not equivalent to saying that state law is divinely inspired, *see State v. Oliver*, 309 N.C. at 359, 307 S.E. 2d at 326, or that law officers are "ordained" by God, *State v. Moose*, 310 N.C. at 501, 313 S.E. 2d at 519-20. The remarks are not so improper as to have mandated *ex mero motu* intervention by the trial court. *See State v. Boyd*, 311 N.C. at 423, 319 S.E. 2d at 199, *cert. denied*, 471 U.S. 1030, 85 L.Ed. 2d 324.

[23]   Defendant next argues that the prosecutor's argument was grossly improper more than once in incorrectly stating the applicable law.

First, the prosecutor argued that mitigation "means to reduce the moral culpability of a killing." He continued,

> Have you seen anything in this lawsuit that reduces the moral, the moral culpability of this heinous, atrocious killing? Have you seen it, Ladies and Gentlemen of the Jury? Have you seen—it goes on to say ". . . to reduce the moral culpability of a killing or makes it less deserving of extreme punishment than other first degree murders."
>
> Why is this—why would this case be less deserving of extreme punishment than any other first degree murder? But that is your test, you see, in considering these mitigating circumstances.

Now, let me tell you something else, before I get into the mitigating circumstances: The defendant, that's the fellow sitting over there. The defendant, the man you are trying, has the burden. He has the burden of persuading you that a mitigating circumstance exists in the first place. That's his burden. He has to do that.

Secondly, he must satisfy you by the preponderance of the evidence. He has to satisfy you that one of these mitigating circumstances exists by the preponderance of the evidence.

Defendant contends that these remarks and portions of the argument that follow, which disparage mitigating circumstances that reflect on a defendant's character as opposed to those that reflect on the particular crime, improperly and prejudicially forced the jury's focus away from considering factors regarding his character. We discern no bias here for the aggravating or mitigating nature of crime over character. The term "mitigating circumstances" has consistently been defined as reflecting both the nature of the crime and the character of the accused. N.C.G.S. § 15A-2000(f) (1983); *State v. Silhan*, 302 N.C. at 273, 275 S.E. 2d at 484.

In addition, defendant insists that the trial court's instructions exacerbated rather than eliminated this erroneous focus. The trial court charged, in part:

The defendant has the burden of persuading you that a given mitigating circumstance exists. The existence of any mitigating circumstance must be established by a preponderance of the evidence; that is, the evidence taken as a whole must satisfy you, not beyond a reasonable doubt, but simply satisfy you that any mitigating circumstance exists. If the evidence satisfies you that a mitigating circumstance exists, you would find that circumstance. If not, you would not find it.

[24] Neither the prosecutor nor the trial court was incorrect in emphasizing that the burden of persuading the jury that mitigating circumstances exist is upon the defendant. *See State v. Kirkley*, 308 N.C. at 224, 302 S.E. 2d at 160. Nor was it incorrect for the prosecutor to define a mitigating circumstance as one that

may reduce the moral culpability of a crime or make it less deserving of extreme punishment than other first degree murders. This was expressly approved as a jury instruction in *State v. Hutchins*, 303 N.C. 321, 351, 279 S.E. 2d 788, 806-07 (1981).

Defendant further argues that these portions of the argument and instructions had the effect of diminishing the jury's understanding that a mitigating circumstance is to be ascribed weight; it is not a tangible "thing" that either exists or does not. *See State v. Goodman*, 298 N.C. at 34, 257 S.E. 2d at 590. We share defendant's concern that the "nuances" of character and circumstance described by mitigating and aggravating circumstances be properly understood by a jury, but it is speculation to suggest that this argument or the trial court's instructions had the effect of misinforming the jury, particularly given the trial court's later instructions:

> [Y]ou are the sole judges of the weight to be given to any individual circumstance which you find, whether aggravating or mitigating. You should not merely add up the number of aggravating circumstances and mitigating circumstances; rather, you must decide from all the evidence what value to give to each circumstance, and then weigh the aggravating circumstances so valued against the mitigating circumstances so valued and finally determine whether the mitigating circumstances outweigh the aggravating circumstances.

[25] Second, defendant contends that the prosecutor misstated the law on diminished capacity. The prosecutor argued that the mitigating circumstance listed at N.C.G.S. § 15A-2000(f)(6)[2] should not be found because there was no evidence of any mental illness or insanity, because defendant fully appreciated the criminality of his acts and was fully capable of conforming his conduct to the requirements of the law, and because there was evidence that defendant was "high," but none that he was intoxicated or so intoxicated that he did not know what he was doing.

---

2. "Mitigating circumstances which may be considered shall include, but not be limited to, the following:

. . .

(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired." N.C.G.S. § 15A-2000(f)(6) (1983).

In pertinent part, this argument does not inaccurately state the law. In *State v. Johnson*, 298 N.C. 47, 68-70, 257 S.E. 2d 597, 613-14 (1979), this Court held that N.C.G.S. § 15A-2000(f)(6) requires a finding that the defendant's capacity to appreciate the criminality of his conduct or to conform that conduct to the requirements of the law was impaired. In *State v. Goodman*, we similarly made it clear that "[w]hen the defendant contends that his faculties were impaired by intoxication, such intoxication must be to a degree that it affects defendant's ability to understand and control his actions before subsection (f)(6) is applicable." 298 N.C. at 33, 257 S.E. 2d at 589. The trial court later instructed the jury:

> The defendant contends that from his drinking. beer, he became high and that this condition impaired him from having the mental or physical capacity to appreciate the criminality of his conduct or to conform to the requirements of the law. The State contends that the defendant knew what he was doing and that his capacity was not impaired.

Clearly, the prosecutor and later the trial court described diminished capacity in nearly identical terms and in terms following the pattern of this Court's language in *Johnson* and *Goodman*. We hold that the prosecutor's reference to insanity, mental illness, and whether defendant "knew" what he was doing, *see State v. Johnson*, 298 N.C. at 67-68, 257 S.E. 2d at 612, while irrelevant under the evidence presented, had no prejudicial impact sufficient to require *ex mero motu* intervention by the trial court.

[26] In his last contention concerned with the propriety of the prosecutor's closing remarks, defendant asserts that the prosecutor misstated the law regarding aggravating circumstances in noting that the victim had no chance to plead with defendant for his life. We have held that under the Fair Sentencing Act, N.C.G.S. § 15A-1340.1 *et seq.* (1983), the mere fact that the victim was attacked without warning is not properly considered as a nonstatutory aggravating factor. *State v. Higson*, 310 N.C. 418, 424, 312 S.E. 2d 437, 441 (1984). As an aggravating circumstance, *per se*, such facts are also improperly considered under the provisions governing sentencing in capital cases. See N.C.G.S. § 15A-2000(e) (1983); *State v. Silhan*, 302 N.C. at 273, 275 S.E. 2d at 484. However, our review of the contested portion of the prosecutor's

argument convinces us that the prosecutor was not arguing that the jury should find the precipitous manner of the victim's death an aggravating circumstance: he was simply describing the offense as it had occurred. In counsels' arguments "[l]anguage may be used *consistent with the facts in evidence* to present each side of the case." *State v. Monk,* 286 N.C. at 515, 212 S.E. 2d at 131. Initiating the argument with a description of a situation in which a victim is killed without the opportunity to plead for his life is proper here because that situation is inherent in the offense of murder by lying in wait.

[27] Defendant next contends that the trial court erred in submitting as an aggravating factor that defendant had a prior conviction of a felony involving the use of violence to a person, N.C.G.S. § 15A-2000(e)(3). Despite defendant's lengthy criminal record, which included several assaults upon other persons, the State introduced evidence of only one offense in support of this aggravating factor. That offense was defendant's conviction, pursuant to a guilty plea, of discharging a firearm into occupied property. One of the State's witnesses testified that she was standing in the ticket booth at a drive-in with defendant's brother Ray when defendant came out of a house across the road, carrying a shotgun. He approached the booth, raised the gun, and fired. The witness felt the pellets fall onto her body; Ray was injured. Defendant suggests that introduction of the conviction and the witness's testimony was insufficient evidence to support the aggravating factor, contending that the State failed to prove that defendant fired "into" the ticket booth or that defendant knew or had reasonable grounds to believe the booth was occupied. *See State v. Williams,* 284 N.C. 67, 73, 199 S.E. 2d 409, 412 (1973).

Defendant pleaded guilty to the charge of firing into occupied property. A plea of guilty, accepted and entered by the trial court, is the equivalent of conviction. *State v. Neas,* 278 N.C. 506, 512, 180 S.E. 2d 12, 16 (1971). Moreover, a plea of guilty "means, nothing else appearing, that [defendant] is guilty upon any and all theories available to the state." *State v. Silhan,* 302 N.C. at 263, 275 S.E. 2d at 478. All that is required in support of this aggravating factor is for the State to show that defendant had been convicted of a felony, that the felony involved the use or threat of violence to the person, and that the conduct occurred prior to the events out of which this trial arose. *State v. Goodman,* 298 N.C. at

22, 257 S.E. 2d at 583. The State met these requisites simply by introducing the record of this offense. However, we have held that "the involvement of the use or threat of violence to the person in the commission of the prior felony may be proven or rebutted by the testimony of witnesses and that the state may initiate the introduction of this evidence notwithstanding defendant's stipulation of the record of conviction." *State v. McDougall*, 308 N.C. 1, 22-23, 301 S.E. 2d 308, 321 (1983).

Defendant also contends that the aggravating factor in N.C.G.S. § 15A-2000(e)(3) is itself unconstitutionally vague and overbroad, and he levels the same charge at the whole of the provisions governing capital sentencing. Defendant failed to raise this issue at the trial level, and ordinarily he is not entitled to appellate review without having done so. *State v. Cumber*, 280 N.C. 127, 131-32, 185 S.E. 2d 141, 144 (1971); *State v. Mitchell*, 276 N.C. 404, 410, 172 S.E. 2d 527, 530-31 (1970). However, in the exercise of its supervisory jurisdiction "[t]his Court may . . . pass upon constitutional questions not properly raised below." *State v. Elam*, 302 N.C. 157, 161, 273 S.E. 2d 661, 664 (1981); N.C.R. App. P. 2. Because this is a capital case, we elect to do so here.

[28] First, defendant's contention that the North Carolina death penalty statute is unconstitutional in its entirety has been consistently rejected. *E.g., State v. Boyd*, 311 N.C. at 435, 319 S.E. 2d at 206, *cert. denied*, 471 U.S. 1030, 85 L.Ed. 2d 324; *State v. Williams*, 304 N.C. 394, 409-10, 284 S.E. 2d 437, 448 (1981); *State v. Barfield*, 298 N.C. 306, 343-54, 259 S.E. 2d 510, 537-44 (1979), *cert. denied*, 448 U.S. 907, 65 L.Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L.Ed. 2d 1181 (1980). Defendant's reasons why we should reverse this pattern rest in part on his argument that the unavailability of a lesser included offense instruction for murder by lying in wait "loads the deck" against him, arbitrarily increasing the chances of his being sentenced to death. In addition, defendant argues that his right to equal protection of the laws is violated where the same evidence may underlie a case of murder by premeditation and deliberation and a case of murder by lying in wait, but that under the former charge a lesser included offense is available, whereas under the latter it is not.

We have answered this contention hereinabove: there is no lesser included offense of murder by lying in wait. Defendant's

constitutional right to equal protection of the laws is not implicated by the class of murder in the first degree with which he is charged and convicted when "the uncontradicted evidence excludes the possibility of a verdict of a lesser degree of guilt than first degree murder." *State v. Allison*, 298 N.C. 135, 148, 257 S.E. 2d 417, 425 (1979). In general, "a defendant is entitled to have a lesser-included offense submitted to the jury only when there is evidence to support it." *State v. Johnson*, 317 N.C. at 204, 344 S.E. 2d at 782. This is so whether that murder was committed by means of lying in wait, *see, e.g., State v. Allison*, 298 N.C. at 148-49, 257 S.E. 2d at 425-26, or by means of poison, *see, e.g., State v. Johnson*, 317 N.C. at 204-05, 344 S.E. 2d at 782, or after premeditation and deliberation, *see, e.g., State v. Strickland*, 307 N.C. at 293, 298 S.E. 2d at 658, or in an attempt to perpetrate a felony, *see, e.g., State v. Warren*, 292 N.C. 235, 242, 232 S.E. 2d 419, 423 (1977). Accordingly, we again hold that N.C.G.S. § 15A-2000 does not violate defendant's constitutional rights.

We have also held that the list of aggravating circumstances in N.C.G.S. § 15A-2000(e) is not unconstitutionally vague. *E.g., State v. Rook*, 304 N.C. 201, 223, 283 S.E. 2d 732, 746 (1981), *cert. denied*, 455 U.S. 1038, 72 L.Ed. 2d 155 (1982); *State v. Barfield*, 298 N.C. at 353, 259 S.E. 2d at 543, *cert. denied*, 448 U.S. 907, 65 L.Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L.Ed. 2d 1181. In *Barfield*, Justice Britt reasoned that:

Sentencing standards are by necessity somewhat general. While they must be particular enough to afford fair warning to a defendant of the probable penalty which would attach upon a finding of guilt, they must also be general enough to allow the courts to respond to the various mutations of conduct which society has judged to warrant the application of the criminal sanction. [Citation omitted.] While the questions which these sentencing standards require juries to answer are difficult, they do not require the jury to do substantially more than is ordinarily required of a fact finder in any lawsuit. [Citation omitted.] The issues which are posed to a jury at the sentencing phase of North Carolina's bifurcated proceeding have a common sense core of meaning. Jurors who are sitting in a criminal trial ought to be capable of understanding them and applying them when they are

given appropriate instructions by the trial court judge. [Citation omitted.]

*Barfield*, 298 N.C. at 353, 259 S.E. 2d at 543, *cert. denied*, 448 U.S. 907, 65 L.Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L.Ed. 2d 1181.

[29] Nevertheless, defendant argues that the "prior violent felony" aggravating factor is itself unconstitutionally vague and overbroad because it fails to define the class of offenders eligible for the death penalty in an "objective, evenhanded, and substantially rational way." *Zant v. Stephens*, 462 U.S. 862, 879, 77 L.Ed. 2d 235, 251 (1983). Defendant suggests this failure is exemplified in holdings that, for purposes of applying that factor, "felony" is not restricted to felonies committed in North Carolina, *see State v. Taylor*, 304 N.C. at 279, 283 S.E. 2d at 780, *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L.Ed. 2d 1456 (Virginia conviction for rape admissible because defendant was convicted of what would be considered a felony in North Carolina), and the possibility of reading the phrases "use of violence" or "threat of violence" to include insignificant and harmless acts, such as slamming a car door on a kidnap victim or verbally challenging the officer arresting one later convicted of a felony.

Defendant then attacks the definition of "felony" in the trial court's instructions concerning this factor, contending that it illustrates this vagueness by including the mere threat of violence to the person. The trial court charged: "A felony involves the use or threat of violence to the person if the perpetrator kills or inflicts physical injury on the victim or threatens to do so in order to accomplish his criminal purpose." Because the only testimony offered concerning this factor was the witness' description of pellets falling onto her body, defendant insists this factor has been unconstitutionally applied because there was no indication that defendant intended to shoot at the witness or even that he knew she was inside the booth.

Defendant's reasoning here is unsupportable. The trial court's instruction was accurate but unnecessary. The action of discharging a firearm into an occupied building is a felony by statutory definition. "Any person who willfully or wantonly discharges or attempts to discharge: . . . (2) A firearm into any

building, structure, vehicle, aircraft, watercraft, or other conveyance, device, equipment, erection, or enclosure while it is occupied is guilty of a Class H felony." N.C.G.S. § 14-34.1 (1986). The jury was not required to determine whether the offense of which defendant had been convicted was a felony, but whether that felony "involv[ed] the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3).

The wording of this factor is not vague or overbroad or so inscrutable that a jury is not "given sufficient guidance concerning the relevant factors about the defendant and the crime which he was found to have committed." *State v. Martin*, 303 N.C. 246, 254, 278 S.E. 2d 214, 219, *cert. denied*, 454 U.S. 933, 70 L.Ed. 2d 240, *reh'g denied*, 454 U.S. 1117, 70 L.Ed. 2d 655 (1981). Criminal felonies are clearly and specifically classified in Chapter 14 of the General Statutes. This aggravating factor contemplates those particular felonies, among those described in Chapter 14, in which violence or physical harm was threatened or intended by the defendant's actions. The factor singles out defendants who have not just harmed or threatened to harm others, but defendants who actually have been convicted of felonies of this nature. These are serious and memorable offenses, they signify materially in the assessment of a defendant's character for sentencing purposes, and their description in the aggravating circumstance in N.C.G.S. § 15A-2000(e)(3) is constitutionally adequate for purposes of guiding the jury to make an informed, not an arbitrary, sentence recommendation.

Defendant next asserts that the trial court twice erred in the midst of the jury's deliberations. In the first instance, the foreman returned to the courtroom after one and one-half hours of deliberations and reported to the trial court: "We haven't reached a decision. We are hung. We can't say that we have reached a verdict." The court held a brief conference in chambers and returned to tell the jury to continue its deliberations. In the second instance, the foreman returned approximately two hours later, reported that "there's a bad argument," and asked the meaning of "extenuating."

[30] Defendant notes the mandate of N.C.G.S. § 15A-2000(b) that, when a jury cannot within a reasonable time unanimously agree to its sentence recommendation, the trial court must impose a

sentence of life imprisonment. Defendant contends that, given the fact that the jury had only one aggravating factor and four mitigating factors to consider, one and one-half hours exceeded the "reasonable time" contemplated by the statute. In addition, defendant notes the language of N.C.G.S. § 15A-1235, which requires the court to instruct the jury before its deliberations that its verdict as to guilt must be unanimous, permits the trial court to instruct the jurors concerning the importance of voting their independent convictions, and permits the court to require a deadlocked jury to resume deliberations with or without a reiteration of the previous instructions. Defendant contends that by allowing the jurors to continue deliberations without further instructions, the court was pressuring the minority members to acquiesce to the will of the majority. He urges this Court to adopt a rule requiring the trial court to instruct a deadlocked jury in accordance with N.C.G.S. § 15A-1235.

We decline to do so for two reasons. First, this Court has recognized the clear intent of the legislature that instructions to a deadlocked jury be within the trial court's discretion. The language is permissive, not mandatory. *State v. Peek*, 313 N.C. 266, 271-72, 328 S.E. 2d 249, 253 (1985). Second, the provisions of N.C.G.S. § 15A-1235 do not govern sentencing procedures in capital cases. Such procedures are codified at N.C.G.S. § 15A-2000, which provides, in pertinent part that "[i]f the jury cannot, within a reasonable time, unanimously agree to its sentence recommendation, the judge shall impose a sentence of life imprisonment . . . ." N.C.G.S. § 15A-2000(b) (1983). This Court has consistently held that what constitutes a reasonable time for jury deliberation at this stage is left to the judgment of the trial judge, who is in the best position to gauge how much time is reasonable under the circumstances of that particular case. *State v. Kirkley*, 308 N.C. at 221, 302 S.E. 2d at 158; *State v. Johnson*, 298 N.C. at 370, 259 S.E. 2d at 762.

[31]  Nor was there error when the trial court responded to the foreman's question as to the meaning of "extenuating" in a nonstatutory mitigating factor by reading from *Webster's New World Dictionary*: "To lessen or seem to lessen the seriousness of . . . (an offense, guilt, et cetera) . . . by giving excuses or serving as an excuse . . . [Extenuating circumstances]." Defendant failed to object when told by the trial court in chambers that she in-

tended to give this response to the foreman's question, and review is therefore limited to determining whether it constituted plain error. *State v. Odom*, 307 N.C. at 660-61, 300 S.E. 2d at 378-79. Unless the words have a technical statutory meaning or one definitely indicated by their context, they should be understood according to their common and ordinary meaning. *State v. Lee*, 277 N.C. 242, 243, 176 S.E. 2d 772, 773 (1970). The dictionary is a universally recognized source of such meaning, one this Court has frequently consulted for definitions. *See, e.g., State v. Adcock*, 310 N.C. 1, 26, 310 S.E. 2d 587, 602 (1984); *State v. Ludlum*, 303 N.C. 666, 671, 281 S.E. 2d 159, 162 (1981). The trial court did not err in similarly resorting to this source in order to define for the jury a word that was neither a term of art nor clearly explained by its context.

[32]   In his remaining assignments of error defendant urges the reconsideration of issues recently resolved by this Court. First, defendant argues that the trial court erred in instructing the jury that evidence from the guilt-innocence phase of the trial was competent for its consideration in the punishment phase. In *State v. Brown*, 306 N.C. at 179-80, 293 S.E. 2d at 587, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642, this Court noted that N.C.G.S. § 15A-2000(a)(3) permits any evidence that the trial court deems to have probative value to be received during the sentencing phase, and added specifically that all evidence submitted during the guilt determination phase is "competent for the jury's consideration in passing on punishment." *Id.* at 180, 293 S.E. 2d at 587. *See also Barfield v. Harris*, 540 F. Supp. 451, 469-70 (E.D.N.C. 1982), *aff'd*, 719 F. 2d 58 (4th Cir. 1983), *cert. denied*, 467 U.S. 1210, 81 L.Ed. 2d 357, *reh'g denied*, 468 U.S. 1227, 82 L.Ed. 2d 920 (1984). We again recall the statutory sanction for the trial court's instructions and hold that they were not erroneous.

[33]   Second, defendant requests that we reconsider our holding in *State v. Barfield*, 298 N.C. at 353-54, 259 S.E. 2d at 544, *cert. denied*, 448 U.S. 907, 65 L.Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L.Ed. 2d 1181, that the concept of due process does not require the State to disprove beyond a reasonable doubt the existence of mitigating circumstances. We decline to do so. Due process does not prohibit placing upon the defendant the burden of proving mitigating circumstances by a preponderance of the evidence. *State v. Kirkley*, 308 N.C. at 224, 302 S.E. 2d at 160.

[34]  Third, defendant argues that requiring jurors to reach unanimous decisions regarding the presence or absence of mitigating circumstances renders the sentencing proceedings arbitrary and capricious because it vests a single juror with the power to deprive all other jurors of consideration of such circumstances. This Court has held that this requirement is constitutionally sound. *State v. Kirkley*, 308 N.C. at 217-19, 302 S.E. 2d at 156-57. Defendant presents no new reason to hold otherwise.

[35]  Defendant next contends that it was error to instruct the jury that it must determine the substantiality of the aggravating factor in light of mitigating circumstances "found" to exist or not. The premise is fallacious, defendant contends: a failure to "find" a mitigating factor does not mean it does not exist. This includes mitigating circumstances that may exist but are not articulated on the issues and recommendation sheet. Defendant invites the Court to allow the jurors free range to "intuit" such unarticulated factors. In other words, defendant urges that we sanction an invitation to caprice in the penalty determination phase of a trial.[3] We decline to do so. "The consideration of mitigating circumstances must be the same as the consideration of aggravating circumstances." *State v. Kirkley*, 308 N.C. at 219, 302 S.E. 2d at 157. There is no reason to confound the jury's decision process with arbitrary, "inarticulable" factors that may be applied in mitigation of a sentence but not in aggravation of it. *See generally State v. Pinch*, 306 N.C. at 33, 292 S.E. 2d at 227, *cert. denied, Smith v. North Carolina*, 459 U.S. 1056, 74 L.Ed. 2d 622, *reh'g denied, Pinch v. North Carolina*, 459 U.S. 1189, 74 L.Ed. 2d 1031,

---

3. In their briefs both defendant and the State characterize this contention as the position taken by Justice (now Chief Justice) Exum in his dissent in *State v. Pinch*, 306 N.C. at 45, 292 S.E. 2d at 234, *cert. denied, Smith v. North Carolina*, 459 U.S. 1056, 74 L.Ed. 2d 622, *Pinch v. North Carolina, reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031. A careful reading of the dissent reveals that its point was not to permit the jury to find unarticulated mitigating circumstances on its own, but to abolish the mandate in the Pattern Jury Instruction that it is the jury's "duty to recommend that defendant be sentenced to death" upon the jury's finding aggravating circumstance(s) that are sufficiently substantial to call for the imposition of the death penalty and that outweigh any mitigating circumstance(s). N.C.P.I. Crim. 150.10, pp. 3-4 (Replacement May 1980). *See* N.C.G.S. § 15A-2000(b) (1983). What Justice Exum described as "nuances" or circumstances of the case that defy articulation are not additional mitigating factors the jury can invent on its own, but ever present influences that affect the *weight* of the factors actually before the jurors. *See State v. Goodman*, 298 N.C. at 34, 257 S.E. 2d at 590.

quoting *State v. Johnson*, 298 N.C. at 63, 257 S.E. 2d at 610:
"[T]he jury may only exercise guided discretion in making the underlying findings required for a recommendation of the death penalty within the 'carefully defined set of statutory criteria that allow them to take into account the nature of the crime and the character of the accused.'" (Emphases omitted.) The opportunity for the input of such "nuances" is when the mitigating circumstances are weighed against those found to be aggravating. *See State v. Goodman*, 298 N.C. at 34, 257 S.E. 2d at 590.

Finally, defendant contends that he was denied his right to a fair trial free from arbitrary, capricious, and extraneous factors, including the influence of passion and prejudice, because of the cumulative effect of the prosecutor's arguments during both the guilt-innocence and penalty phases of his trial. Defendant asks no more than the law already requires. This Court must review the record in a capital case to determine whether it supports the jury's finding of any aggravating circumstance(s) and whether "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." N.C.G.S. § 15A-2000(d)(2) (1983). In accord with this responsibility, we have reviewed the trial records as well as the briefs and oral arguments before this Court. We conclude that the arguments had no malignant, cumulative effect upon the fairness of defendant's trial. This Court's conclusions regarding similar contentions made by the defendant in *State v. Thompson*, 293 N.C. at 719-20, 239 S.E. 2d at 470, are appropriate:

The record does not reveal such prosecutorial misconduct nor such improprieties as those involved in *State v. Britt*, 288 N.C. 699, 220 S.E. 2d 283 (1975), or *State v. Smith*, 279 N.C. 163, 181 S.E. 2d 458 (1971). Nor does the record reveal an attempt to argue matters not legitimately arising on the evidence. Compare *State v. Roach*, 248 N.C. 63, 102 S.E. 2d 413 (1958). Moreover, no violation of G.S. 8-57 or G.S. 8-54 appears, as in *State v. Thompson*, 290 N.C. 431, 226 S.E. 2d 487 (1976), and *State v. Monk*, 286 N.C. 509, 212 S.E. 2d 125 (1975).

While the courtroom conduct of [this] District Attorney . . . in many cases reflects a callous indifference to decisions of this Court, . . . we find in this case no impropriety of sufficient moment to warrant a new trial.

In addition, the facts of record speak for themselves. There is ample evidence that defendant shot his victim after waiting for him to position himself in the window by his desk. The single aggravating factor found by the jury—that defendant had been convicted of a violent felony—is also solidly established in the record. The jury found that this aggravating circumstance was sufficiently substantial to warrant the imposition of the death penalty and found no mitigating circumstance to counterbalance it. The record objectively demonstrates that the jury's finding of guilt and its recommendation that the sentence of death be imposed met the standard of reliability that the Eighth Amendment requires. *See Caldwell v. Mississippi*, 472 U.S. 320, 340, 86 L.Ed. 2d 231, 246 (1985). We conclude that, as to the sentencing phase of his trial, defendant received a fair hearing free from prejudicial error.

### PROPORTIONALITY REVIEW

[36] Statutory provisions governing capital sentencing direct this Court to review the record and determine (1) whether it supports the jury's finding of the aggravating circumstance upon which the sentencing court based its sentence of death, (2) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and (3) whether the "sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (1983). We conclude, first, that the record from both the guilt and the sentencing phases reveals no suggestion that the sentence of death was influenced by passion, prejudice or any other arbitrary factor. Second, the introduction of defendant's criminal record was sufficient evidentiary support for the jury's finding of the single aggravating factor that defendant had been previously convicted of a felony involving the use or threat of violence to a person, N.C.G.S. § 15A-2000(e)(3). Third, proportionality review demonstrates that the sentence of death is neither excessive nor disproportionate.

For purposes of proportionality review, the pool of similar cases includes

> *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in

which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation.

*State v. Williams*, 308 N.C. 47, 79, 301 S.E. 2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). The pool is further restricted to those cases that this Court has found to be free of error in both phases of the trial. *State v. Stokes*, 319 N.C. 1, 19-20, 352 S.E. 2d 653, 669 (1987). The Court's task is generally to compare the case at bar with other cases in the pool that are "roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E. 2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L.Ed. 2d 267 (1985). For this purpose, the manner in which the crime was committed and defendant's character, background, and physical and mental condition are relevant considerations. *Id.*

> If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*Id.*

We assume the task of proportionality review in this case by making the comparison twice. First, this crime and this defendant are compared with the crime and the defendant in cases with similar facts, including cases in which the same aggravating circumstance was found. Second, this case is compared to cases in which this Court has affirmed a sentence of death in order to determine whether this case "rise[s] to the level of those murders in which we have approved the death sentence upon proportionality review." *State v. Bondurant*, 309 N.C. 674, 693, 309 S.E. 2d 170, 182 (1983), quoting *State v. Jackson*, 309 N.C. 26, 46, 305 S.E. 2d 703, 717 (1983).

This case is distinguished by these features: it is a case of murder in the first degree on the basis of lying in wait; it is a

State v. Brown

case in which a single aggravating circumstance was found—that defendant had been convicted of a felony of violence, N.C.G.S. § 15A-2000(e)(3); and it is a case in which no mitigating factors were found, although four were submitted to the consideration of the jury.[4]

There is only one other lying in wait case in the. proportionality pool.[5] Its similarity to this case is merely generic, for it was a case in which the defendant was convicted of murder in the first degree as an accessory before the fact. In *State v. Woods*, 307 N.C. 213, 297 S.E. 2d 574, the defendant was sentenced to life imprisonment for having encouraged her lover to murder her husband. We noted in *Woods* that distinctions between an accessory before the fact and the principal had been abolished for purposes of sentencing and guilt by the enactment of N.C.G.S. § 14-5.2, but that the elements of being an accessory before the fact had remained the same, *viz*, that the defendant counseled, procured or commanded the principal to commit the offense, that the defendant was not present when the offense was committed, and that the principal committed the offense. N.C.G.S. § 14-5.2 (1981); *State v. Woods*, 307 N.C. at 217-18, 297 S.E. 2d at 577. Despite the legislature's recognition that the criminal responsibility of an accessory before the fact is equivalent to that of the principal who commits the murder by lying in wait, the criminal actions of each are dissimilar. For that reason *Woods* is not a true analogue to the case *sub judice* for purposes of proportionality review.

The current proportionality pool includes only one case similar to that at bar. In *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170, the defendant, riding in a car with several others, pointed a gun at the victim's head and taunted him, saying, "You don't believe I'll shoot you, do you?" After at least two minutes, the defendant pulled the trigger, despite the pleas of his companions

4. The jury considered but did not find that defendant's capacity to appreciate the criminality of his conduct or to conform that conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6), that defendant was reared without a father, that he had little education, and that there were extenuating circumstances between defendant and the deceased, N.C.G.S. § 15A-2000(f)(9).

5. *State v. Allison*, 298 N.C. 135, 257 S.E. 2d 417, also a lying in wait case, was tried on 20 June 1977. Because the offense was committed prior to the effective date of N.C.G.S. § 15A-2000, its provisions did not apply to sentencing. For this reason we disregard it as a comparable case for purposes of proportionality review.

not to do so. This Court held that the evidence supported submission of the "especially heinous" and the "course of violent conduct" aggravating circumstances, N.C.G.S. § 15A-2000(e)(11). The Court concluded, however, that the sentence of death was excessive and disproportionate, partly because defendant and his companions were highly intoxicated, because there was no apparent motive for the killing, and, most important, because defendant had immediately exhibited remorse and concern for the victim and had personally and immediately sought medical assistance for him. *State v. Bondurant*, 309 N.C. at 693-94, 309 S.E. 2d at 182-83. Comparison of this case to *Bondurant* is unenlightening because of the dramatic contrast between the remorseful character of the defendant in that case and the consummately uncontrite character of the defendant here.

There are no other lying in wait cases in the current proportionality pool. Outside the pool, however, there are four other "premeditated and deliberated" murder cases in which the defendant was sentenced to death but in which this Court found that the "heinous, atrocious or cruel" aggravating factor was erroneously submitted during the sentencing phase. These cases are similar to the case *sub judice* in that all are characterized by the unprovoked shooting of a victim who was singled out for attack.

In *State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837, the defendant lay in wait for the victim yet was tried for murder in the first degree on the basis of premeditation and deliberation. The defendant had waited briefly in the vestibule of a nightclub for his victim. As soon as the victim entered, the defendant shot him several times. There was evidence that the defendant and the deceased had fought the previous week and that ill will persisted between them. This Court held that it was error to submit to the jury the single aggravating factor that the murder had been especially heinous, atrocious or cruel, N.C.G.S. § 15A-2000(e)(9), because the victim had been wholly unaware of the defendant's presence and because he had been rendered unconscious by the first shot that struck him. *State v. Hamlet*, 312 N.C. at 176, 321 S.E. 2d at 846. The Court accordingly vacated the sentence of death and imposed one of life imprisonment. N.C.G.S. § 15A-2000 (c)(2).

In *State v. Stanley*, 310 N.C. 332, 312 S.E. 2d 393 (1984), the defendant drove his car to his mother-in-law's house and travelled

back and forth several times while his estranged wife ate supper inside with her family. Shortly afterwards, when his wife had gone out for a walk with her son and her sister, the defendant drove up next to the trio and shot his wife. This Court reduced the sentence of death to one of life imprisonment because the single, "especially heinous" aggravating factor was not borne out by the evidence: there was neither a prolonged, tortured death, nor evidence that the defendant had psychologically tortured his wife by "stalking" her or by killing her after she had begged for her life. *State v. Stanley*, 310 N.C. at 340-41, 312 S.E. 2d at 398.

In *State v. Moose*, 310 N.C. 482, 313 S.E. 2d 507, the defendant was closely "tailing" the car driven by the victim, honking his horn and bumping the back of the victim's car, and ignoring every opportunity to pass. The victim pulled into a parking lot. The defendant drove up beside him, pointed a shotgun at the victim, and, after about five seconds, shot and killed him. The jury found two aggravating factors: that the killing had been especially heinous and that defendant had knowingly created a great risk to the lives of more than one person by means of a hazardous weapon or device, N.C.G.S. § 15A-2000(e)(10) (1983). This Court remanded for resentencing, holding that the evidence was insufficient to support the finding of the "especially heinous" aggravating factor: the victim had indicated only that he was "wondering" what the defendant was doing; he had given no sign that he was suffering the anxiety or psychological agony of being "stalked." *State v. Moose*, 310 N.C. at 495-96, 313 S.E. 2d at 516.

In *State v. Hamlette*, 302 N.C. 490, 276 S.E. 2d 338 (1981), the defendant, without any established motive, shot the victim three times from behind. The jury found two aggravating circumstances: that the defendant had been previously convicted of a felony involving the threat or use of violence to the person, N.C.G.S. § 15A-2000(e)(3) (1983), and that the murder was especially heinous. This Court again found that submission of the "especially heinous" factor was not supported by the evidence and granted the defendant a new trial because of this and other errors. Although the victim had lingered twelve days before dying, this case was not "unnecessarily tortu[r]ous or outrageously wanton or vile" in comparison with other capital cases in which the factor had been found and its finding affirmed. *State v. Hamlette*, 302 N.C. at 504, 276 S.E. 2d at 347.

While this group of cases shares strongly analogous facts with the case *sub judice,* there are significant differences. All four cases are differentiated by the presence of the "especially heinous, atrocious or cruel" aggravating circumstance, and in all four that circumstance was held to have been erroneously submitted. The "especially heinous" aggravating circumstance was not submitted to the jury in this case, and for that reason the results of this Court's review of *Hamlet, Stanley, Moose,* and *Hamlette* do not provide a meaningful foil for appreciating the unique facts of the case before us. Moreover, because these cases are not in the pool, they provide no insights for purposes of proportionality review.

Another approach to describing a cohort of similar cases is to single out those in which the same aggravating circumstance was found. N.C.G.S. §§ 15A-2000(e)(3) and (e)(2)[6] are the only enumerated aggravating circumstances that reflect upon the defendant's character as a recidivist. N.C.G.S. § 15A-2000(e)(3) in particular tends to demonstrate that the crime committed was part of a long-term course of violent conduct, as opposed to the situational course of conduct culminating in the murder itself. *Cf.* N.C.G.S. § 15A-2000(e)(11).

There are thirteen cases in the proportionality pool and among capital cases outside the pool that are factually similar to the case at bar and in which the (e)(3) factor figured in the jury's determination of the defendant's sentence. In five of these the sentence of death was affirmed on review; in eight the jury either recommended life imprisonment or its recommendation of death did not withstand appellate review.

The five cases in the "death-affirmed" pool in which the (e)(3) factor was found are all distinguishable from this case by the finding in all five of multiple aggravating circumstances, notably including circumstances describing a course of violent or felonious conduct, N.C.G.S. § 15A-2000(e)(5) ("capital felony was committed while the defendant was engaged . . . in the commission of, . . . or flight after committing or attempting to commit, any homicide, robbery, rape or a sex offense, arson, burglary, kidnapping, or air-

---

6. "The defendant had been previously convicted of another capital felony." N.C.G.S. § 15A-2000(e)(2) (1983). To date, this factor has not appeared in any case reviewed by this Court for proportionality purposes.

craft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb") or N.C.G.S. § 15A-2000(e)(11) ("murder . . . was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons").

In *State v. Robbins*, 319 N.C. 465, 356 S.E. 2d 279 (1987), defendant's sentence of death for the shooting of a fifty-three-year-old woman was upheld on appellate review. (Charges against defendant arising from a second murder resulted in a remand for resentencing.) This Court found evidentiary support for the two aggravating circumstances found by the jury—N.C.G.S. §§ 15A-2000(e)(3) and (e)(5). The jury found at least one of the three mitigating circumstances submitted but did not specify which one(s).

In *State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808 (1985), *cert. denied*, --- U.S. ---, 90 L.Ed. 2d 733 (1986), the defendant murdered a clerk in the course of robbing a convenience store. Evidence was presented that the victim's death by bleeding from six bullet wounds over a course of fifteen minutes was accompanied by psychological torture and great physical pain. In support of its recommended sentence of death, the jury found no mitigating circumstances to outweigh its finding of the "prior violent felony," the "especially heinous," and the "course of violent conduct" aggravating circumstances, (e)(3), (e)(9), (e)(11).

In *State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 173 (1983), the defendant attacked the victim and her roommate with a knife, stabbing the victim twenty-two times. There was some evidence to show that the victim may have been sexually assaulted. In addition to the (e)(3) aggravating circumstance, the jury found that the murder had been committed as part of a course of violent conduct, (e)(11), and that it had been especially heinous, atrocious or cruel, (e)(9). It found three mitigating circumstances based in part upon evidence presented by the defendant that he suffered from cocaine-induced psychosis: mental or emotional disturbance, (f)(2), impaired capacity, (f)(6), and the "catchall" circumstance, (f)(9).

In *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761, *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L.Ed. 2d 1456, the course of defendant's conduct included kidnap-

ping, armed robbery, and murder. In addition to the (e)(3) circumstance, the jury found that the murder was committed for pecuniary gain and that it was committed while defendant was engaged in the commission of a felony, (e)(5). It found no mitigating circumstances.

In *State v. McDowell*, 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied*, 450 U.S. 1025, *reh'g denied*, 451 U.S. 1012, 68 L.Ed. 2d 865 (1981), the defendant injured one girl and murdered another with a machete after the victims rebuffed his attempts at sexual assault. The jury found that the murder was heinous, atrocious or cruel, that it was committed as part of a course of violent conduct, (e)(11), as well as the (e)(3) circumstance.

In five other cases in the proportionality pool and among other capital cases that have come before us for review, the (e)(3) recidivist circumstance was found, but, with one exception, in which the sentence of death was reduced on review to life imprisonment, the cases were remanded for resentencing. Except for *State v. Hamlette*, 302 N.C. 490, 276 S.E. 2d 338, these cases appear more akin to the "death-affirmed" cases in which the (e)(3) circumstance was found than to the case at bar:

In *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551, *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 796, the defendant committed felony murder in the course of the armed robbery of a convenience store. The jury found three aggravating factors: "prior violent felony," (e)(3), "murder committed in the course of committing a felony," (e)(5), and "pecuniary gain," (e)(6). This Court held that it was error to submit as an aggravating circumstance the felony underlying the felony murder.

In *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569, the deceased was shot numerous times, cut with a knife, then, still alive and begging for his life, thrust into the trunk of a car, and finally taken out and shot in the head. The jury found five aggravating circumstances, including (e)(3), and no circumstances in mitigation. This Court held that it was error to submit more than one aggravating circumstance based upon the same evidence and remanded for resentencing.

In *State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450, the defendant forced two girls into the woods, sexually assaulted them, and

stabbed them. One died. This Court held that it was error to submit the aggravating circumstance that the murder had occurred in the commission of a felony when the jury had not specified whether it based its first-degree murder verdict on felony murder or on premeditation and deliberation. The case was remanded for resentencing.

In *State v. Beal*, 311 N.C. 555, 319 S.E. 2d 557 (1984), the defendant sexually assaulted a female, beat her head in with a concrete block, then stuffed her body in a trash barrel, covered it with kerosene, and ignited it. This Court vacated the death sentence and imposed one of life imprisonment after holding that the trial court had erred in submitting an adjudication of defendant as a youthful offender as a "prior conviction" under the (e)(3) aggravating circumstance.

From the pool of cases in which the defendant was sentenced at trial to life imprisonment, only three share both the (e)(3) aggravating circumstance and facts similar to those in the case before us. *State v. Williams*, 315 N.C. 310, 338 S.E. 2d 75 (1986), is strikingly like *State v. Woods*, 307 N.C. 213, 297 S.E. 2d 574, in that the defendant conspired with his girlfriend to murder her mother for a portion of the insurance proceeds. In addition to (e)(3), the jury found that the murder had been committed for pecuniary gain, (e)(6). Five mitigating circumstances were submitted, but the jury did not specify which outweighed the aggravating factors, nor did it even indicate whether the aggravating factors were sufficiently substantial to merit the death penalty.

*State v. Crawford*, 301 N.C. 212, 270 S.E. 2d 102 (1980), and *State v. Pridgen*, 313 N.C. 80, 326 S.E. 2d 618 (1985), are more similar to the case before us, both in the submission of the single (e)(3) aggravating factor and in their facts. In *Crawford* the defendant told an acquaintance that he would kill somebody before the day was out. Shortly thereafter, the victim walked up to him, greeted him, met the response, "I'll show you how I'm doing," and was shot by a sawed-off shotgun the defendant was carrying in a paper bag. The defendant was taken into custody after he emerged from a crowd around the still-living victim, said "I shot the s--of a b----," and kicked the victim in the head, saying, "I thought you were dead." In *Pridgen* there was testimony from

one of the defendant's co-workers that the defendant had called the victim a "rat," and intimated that he was going to "take care" of the victim or have another do so. Shortly after the murder, the defendant was said to have smiled and stated, "somebody got that boy." In both of these cases there was obvious ill will between the defendants and the victims, and the murders were purposeful acts of exercising a grudge. There were three mitigating circumstances submitted for the consideration of the jury in each case; whether these were found was not specified in *Pridgen*. Despite their similarities, the submission of mitigating circumstances not submitted here and the absence of evidence indicating lying in wait differentiate these cases from this one.

A second approach to proportionality review is to classify "death-affirmed" cases according to characteristics *not* present in the case *sub judice* and to determine whether the absence of those characteristics reasonably excludes the case *sub judice* from that group. *See State v. Bondurant*, 309 N.C. at 693-94, 309 S.E. 2d at 182-83. The crime committed by defendant was, like that committed by the defendant in *Bondurant*, "a senseless . . . killing." *Id.* at 693, 309 S.E. 2d at 182. However, it was not a felony murder case or one in which the defendant was motivated to kill by avarice or lust. *Cf., e.g., State v. Vereen*, 312 N.C. 499, 324 S.E. 2d 250, *cert. denied*, 471 U.S. 1094, 85 L.Ed. 2d 526 (1985) (aggravating circumstances found: that murder committed while defendant was engaged in first-degree burglary and that murder was part of a course of violent conduct); *State v. Gardner*, 311 N.C. 489, 319 S.E. 2d 591 (1984), *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369 (1985) (murder committed in course of robbing a restaurant waitress and manager); *State v. Craig and Anthony*, 308 N.C. 446, 302 S.E. 2d 740, *cert. denied*, 464 U.S. 908, 78 L.Ed. 2d 247 (1983) (defendants stabbed the victim thirty-seven times, then took her pocketbook); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510, *cert. denied*, 448 U.S. 907, 65 L.Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L.Ed. 2d 1181 (murder by poison motivated by fear victim would reveal that defendant had forged a check on his account).

Nor was the murder a torturous one, such as those committed in these cases: *State v. Gladden*, 315 N.C. 398, 340 S.E. 2d 673, *cert. denied*, --- U.S. ---, 93 L.Ed. 2d 166 (1986) (victim shot, his throat slashed, and left to die in a ditch); *State v. Huffstetler*, 312

N.C. 92, 322 S.E. 2d 110, *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (victim battered to death by multiple and heavy blows of an iron skillet); *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197 (1984) (member of defendant's burglary gang bound, beaten, shot, and stabbed, despite begging for his life); *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (victims stabbed repeatedly, then disemboweled); *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (sentence recommendation by jury for defendant's sexual assault and murder of 100-year-old victim included heinous, atrocious or cruel and pecuniary gain aggravating circumstances); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (shooting of attendant and customer, although one pleaded for his life, during robbery of a convenience store); *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, *Smith v. North Carolina*, 459 U.S. 1056, 74 L.Ed. 2d 622, *reh'g denied*, *Pinch v. North Carolina*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (murder of two people at motorcycle club, one of whom begged for his life); *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732, *cert. denied*, 455 U.S. 1038, 72 L.Ed. 2d 155 (defendant kidnapped, raped, beat victim, drove over her with automobile, and left her to die); *State v. Smith*, 305 N.C. 691, 292 S.E. 2d 264, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, *Williams v. North Carolina*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983) (defendant kidnapped three girls at gunpoint, robbed them, forced two into the car trunk, raped and beat the third to death); *State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214, *cert. denied*, 454 N.C. 933, 70 L.Ed. 2d 240, *reh'g denied*, 454 U.S. 1117, 70 L.Ed. 2d 655 (victim alive and begging for her life during twenty-five-minute period in which she was shot six times, then beaten).

Nor was this a case like *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981), in which the jury found the aggravating circumstances that the murder was committed for the purpose of avoiding or preventing a lawful arrest, (e)(4), and that it had been committed against a law enforcement officer, (e)(8). *See also State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493, *cert. denied*, 471 U.S. 1120, 86 L.Ed. 2d 267 (aggravating circumstances found: murder committed as part of course of violent conduct, (e)(11), and in order to avoid arrest, (e)(4) ).

---

---

The most striking feature of this list is the number of cases in which the heinous, atrocious or cruel aggravating circumstance was present. However, not all of the "death-affirmed" cases are characterized by a finding of this circumstance, and it is against these six other cases that the case *sub judice* can perhaps be more fruitfully juxtaposed. *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788, and *State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493, are markedly unlike the case at bar because they involved murders committed upon law enforcement officers or murders committed in the attempt to elude the law. Just as our individual consciences are shocked by heinous, atrocious or cruel murders, the collective conscience requires the most severe penalty for those who flout our system of law enforcement. The aggravating factors in N.C.G.S. §§ 15A-2000(e)(8) and (e)(4) reflect the General Assembly's recognition of this common concern.

Murders were perpetrated in the course of a felony or otherwise violent conduct in these cases: *State v. Vereen*, 312 N.C. 499, 324 S.E. 2d 250, *cert. denied*, 471 U.S. 1094, 85 L.Ed. 2d 526; *State v. Gardner*, 311 N.C. 489, 319 S.E. 2d 591, *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369; *State v. Williams*, 305 N.C. 656, 292 S.E. 243, *cert. denied, Smith v. North Carolina*, 459 U.S. 1056, 74 L.Ed. 2d 622, *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031; and *State v. Taylor*, 304 N.C. 249, 283 S.E. 2d 761, *cert. denied*, 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L.Ed. 2d 1456. Multiple aggravating circumstances were found in all except *Williams*.

In *Williams* the jury found only the "course of violent conduct" aggravating circumstance, (e)(11), and seven mitigating circumstances. The defendant had consumed alcohol and a panoply of drugs before killing a gas station attendant during a robbery. Although the gravamen of the murder in *Williams* does not appear to be as extreme as that in cases in which the "heinous, atrocious or cruel" aggravating factor was upheld on review, the motives and the method of murder are in no way similar to those here. With the exception of an alcohol- or drug-induced bravado insufficient to impair judgment or behavior and thus insufficient to support the mitigating circumstance in N.C.G.S. § 15A-2000 (f)(6), these murders have little in common.

The exhaustive process of proportionality review has revealed no case in our pool sufficiently similar to that here that

the sentences can be meaningfully compared. A juxtaposition to "death-affirmed" cases has proved similarly unenlightening. This case stands apart from the others in the pool. Our comparison nonetheless leads to the conclusion that we cannot hold as a matter of law that the death sentence was disproportionate in this case. *See State v. Robbins*, 319 N.C. 465, 356 S.E. 2d 279 (1987).

Among our statutory duties is that requiring a comparison of this case with other cases in the pool that are "roughly similar" regarding the crime and the defendant. N.C.G.S. § 15A-2000(d)(2); *State v. Lawson*, 310 N.C. at 648, 314 S.E. 2d at 503, *cert. denied*, 471 U.S. 1120, 86 L.Ed. 2d 267. The nature of the crime and the character of the defendant in every instance distinguish this case in some way from others in the pool. Nevertheless, in fulfilling our statutory duty to determine proportionality by "considering both the crime and the defendant," N.C.G.S. § 15A-2000(d)(2), the following considerations inform our decision that the penalty imposed here was not disproportionate:

The crime was committed by lying in wait outside the victim's home. The sanctity of the home is a revered tenet of Anglo-American jurisprudence. *See, e.g., Segura v. United States*, 468 U.S. 796, 810, 82 L.Ed. 2d 599, 612 (1984) ("The sanctity of the home is not to be disputed."). The law recognizes the special status of the home, giving one the right to defend it. "A man's house, however humble, is his castle, and his castle he is entitled to protect against invasion . . . ." *State v. Gray*, 162 N.C. 608, 613, 77 S.E. 833, 835 (1913), quoting I Wharton's Criminal Law, sec. 503 (9th ed.), and citing 1 J. Bishop, *New Criminal Law*, sec. 858 and 1 Hale, *Pleas of the Crown*, sec. 458. And the law has consistently acknowledged the expectation of and right to privacy within the home. *See, e.g., Segura v. United States*, 468 U.S. at 820, 82 L.Ed. 2d at 619 (Stevens, J., dissenting) ("Nowhere are expectations of privacy greater than in the home."). This crime shocks the conscience, not only because a life was senselessly taken, but because it was taken by the surreptitious invasion of an especially private place, one in which a person has a right to feel secure. *Cf. State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837 (defendant laid in wait for victim in the vestibule of a nightclub).

The murder was committed after defendant had lain in wait under the victim's window and paused for the victim to position

himself in the most opportune place for annihilation. The victim, unaware of the threat, had no opportunity to defend himself. *See State v. Wiseman*, 178 N.C. at 790, 101 S.E. at 631 ("taking the victim unawares without opportunity to defend himself"). Unlike the victim felled in a face-to-face confrontation, this victim had no chance to fight for his life.

The crime was as calculated and deliberate as a murder can be. In the lengthy, purposeful plotting, and in the execution of his crime, the defendant displayed a cold callousness and obliviousness to the value of human life. He had demonstrated these qualities before: his criminal record was replete with evidence of his dangerousness and propensity to act violently towards others, including the discharge of a shotgun into an occupied building.

In addition, defendant displayed absolutely no remorse or contrition for his act. *Cf. Bondurant*, 309 N.C. at 694, 309 S.E. 2d at 182-83 (defendant's expression of remorse and concern for the victim's life immediately following the shooting a significant factor in Court's vacating death sentence as disproportionate). His behavior after the murder was marked by self-congratulatory bragging and laughter. There was evidence before the jury that defendant admitted he had "killed two others besides," and although there was no evidence in the record that this was indeed so, the statement is a telling indicator of defendant's disregard for the sanctity of human life.

The only evidence in the record with any tendency to diminish defendant's moral culpability is that the victim had mistreated defendant and that defendant had been drinking. However, the jury expressly refused to find extenuating circumstances between defendant and victim as a mitigating factor, N.C.G.S. § 15A-2000 (f)(9) (1983), or that defendant's capacity to appreciate the criminality of his conduct or to conform that conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6) (1983). Viewed in light of the evidence regarding the nature of the crime and the character of the defendant, we find the evidence diminishing culpability minuscule and insufficient to warrant a holding of disproportionality.

Even if, as one member of this Court has suggested, "[t]he death penalty, if we are to have it at all, should be reserved for first degree murders which are the products of the meanness of

mature, calculating, fully responsible adults," *State v. Rook*, 304 N.C. 201, 247, 283 S.E. 2d 732, 759, *cert. denied*, 455 U.S. 1038, 72 L.Ed. 2d 155 (1981) (Exum, J., now C.J., dissenting in part), surely this is such a murder. "If we are to have a death penalty—and our legislature has dictated that we shall—" *State v. Stokes*, 319 N.C. 1, 29, 352 S.E. 2d 653, 669 (1987) (Mitchell, J., dissenting), surely a case such as this is one in which the jury may recommend it. N.C.G.S. § 15A-2000(b) (1983).

We find no error in the guilt or sentencing phases of defendant's trial. In comparing this case to similar cases in which the death penalty was imposed, and in considering both the crime and the defendant, we cannot hold as a matter of law that the death sentence was disproportionate or excessive. We thus decline to set aside the penalty imposed.

No error.